SANTOVINCENZO, CONSUL OF THE KINGDOM OF ITALY AT NEW YORK, *v.* EGAN, PUBLIC ADMINISTRATOR, ET AL.

No. 31. Argued October 22, 1931.—Decided November 23, 1931.

32

*Mr. Carroll G. Walter,* with whom *Mr. Ralph Atkins* was on the brief, for appellant.

*Mr. Robert P. Beyer*, Deputy Assistant Attorney General of New York, with whom *Mr. John J. Bennett, Jr.,* Attorney General, was on the brief, for appellee.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Antonio Comincio, a native of Italy, died intestate in New York City sometime prior to March 10, 1925, when letters of administration were issued to the respondent as Public Administrator by the Surrogates' Court of New York County. Upon the judicial settlement of the administrator's account, the appellant, the Consul General of 'Italy at New York, presented the claim that the decedent at the time of his death was a subject of the King of Italy and had left no heirs or next of kin, and that, under Article XVII of the Consular Convention of 1878 between the United States and Italy, the petitioner was entitled to receive the net assets of the estate for distribution to the Kingdom of Italy. The Attorney General of New York contested the claim. The Surrogates' Court, finding that the domicile of the decedent was in New York City, decreed that the balance of the estate, amounting to $914.64, after payment of debts and the sums allowed as commissions and as expenses of administration, be paid into the treasury of New York City for the use and benefit of the unknown kin of the decedent. The decree was affirmed by the Appellate Division of the Supreme Court of the State, First Department, and both the Appellate Division and the Court of Appeals of the State denied leave to appeal to the latter court. The case may

be regarded as properly here on certiorari. Jud. Code, § 237 (c); U. S. C., Tit. 28, § 344 (c).

There is no controversy as to the facts. The decedent was never naturalized, and at the time of his death was an Italian subject. He had lived in New York for many years, and the finding that the decedent was domiciled there is not open to question. Nor were any heirs or next of kin discovered. The testimony introduced on behalf of the Italian Consul General, which was undisputed, stated that the decedent had no relatives, and the decree of the Surrogates' Court recited that next of kin were unknown. The decree was made pursuant to c. 230 of the Laws of New York of 1898. The Surrogate said in his opinion: "Pursuant to our statutes this amount would be directed in the decree to be paid into the city treasury of the City of New York to await ascertainment of the next of kin. Ultimately the amount would find its way into the treasury of the State of New York."

The provision of the Consular Convention between the United States and Italy, under which the claim of the Italian Consul General was made, provides (20 Stat. 725, 732):

"Article XVII. The respective Consuls General, Consuls, Vice-Consuls and Consular Agents, as likewise the Consular Chancellors, Secretaries, Clerks or Attaches, shall enjoy in both countries, all the rights, prerogatives, immunities and privileges which are or may hereafter be granted to the officers of the same grade, of the most favoured nation."

Pursuant to this agreement, the Italian Consul General sought the application of Article VI of the Treaty between the United States and Persia of 1856, as follows (11 Stat. 709, 710):

"Article VI. In case of a citizen or subject of either of the contracting parties dying within the territories of the other, his effects shall be delivered up integrally to

the family or partners in business of the deceased; and in case he has no relations or partners, his effects in either country shall be delivered up to the consul or agent of the nation of which the deceased was a subject or citizen, so that he may dispose of them in accordance with the laws of his country."

This Treaty with Persia was terminated on May 10, 1928, but, as this was subsequent to the death of the Italian national whose estate is in question, the termination does not affect the present case.

It may be assumed that Article XVII of the Consular Convention with Italy contemplates reciprocity with respect to the rights and privileges sought, and there is no suggestion that Italy has not recognized the right of consuls of the United States to take the effects of the citizens of the United States dying in Italy in circumstances similar to those in which the present claim of the Italian Consul General is pressed. As, in this view, there appears to be no ground for denying the right of the Italian Consul General to demand the application of the last clause of Article VI of the Treaty with Persia, the only question is as to the interpretation of that provision.

We are not here concerned with questions of mere administration, nor is it necessary to determine that the loose phrasing of the provisions of Article VI precludes an appropriate local administration to protect the rights of creditors. Nor have we to deal with a case of testamentary disposition. In this instance there is no will, administration has been had, creditors have been paid, proper steps have been taken, without success, to discover kin of the decedent, and, assuming the absence of relatives, the question is one of escheat, that is, whether the net assets shall go to Italy or to the State of New York. The provision of Article VI of the Treaty with Persia does not contain the qualifying words " conformably with the laws of the country " (where the death occurred) as in

the case of the Treaty between the United States and the Argentine Confederation of 1853 (Art. IX, 10 Stat. 1001, 1009; *Rocca* v. *Thompson,* 223 U. S. 317, 326, 330, 332); or the phrase " so far as the laws of each country will permit," as in the Consular Convention between the United States and Sweden of 1910 (Art. XIV, 37 Stat. 1479, 1487, 1488; *Rocca* v. *Thompson, supra; Matter of D'Adamo,* 212 N. Y. 214, 222, 223; 106 N. E. 81). The omission from Article VI of the Treaty with Persia of a clause of this sort, so frequently found in treaties of this class, must be regarded as deliberate. In the circumstances shown, it is plain that effect must be given to the requirement that the property of the decedent " shall be delivered up to the consul or agent of the nation of which the deceased was a subject or citizen, so that he may dispose of them in accordance with the laws of his country," unless a different rule is to apply simply because the decedent was domiciled in the United States.

The language of the provision suggests no such distinction and, if it is to be maintained, it must be the result of construction based upon the supposed intention of the parties to establish an exception of which their words give no hint. In order to determine whether such a construction is admissible, regard should be had to the purpose of the Treaty and to the context of the provision in question. The Treaty belongs to a class of commercial treaties the chief purpose of which is to promote intercourse, which is facilitated by residence. Those citizens or subjects of one party who are permitted under the Treaty to reside in the territory of the other party are to enjoy, while they are such residents, certain stipulated rights and privileges. Whether there is domiciliary intent, or domicile is acquired in fact, is not made the test of the enjoyment of these rights and privileges. The words " citizens " and " subjects " are used in several articles of the Treaty with Persia and in no instance are

they qualified by a distinction between residence and domicile. Thus, in Article III we find the following provision (11 Stat. 709):

" Article III. The citizens and subjects of the two high contracting parties, travellers, merchants, manufacturers, and others, who may reside in the territory of either country, shall be respected and efficiently protected by the authorities of the country and their agents, and treated in all respects as the subjects and citizens of the most favored nation are treated."

It would be wholly inadmissible to conclude that it was the intention that citizens of the United States, making their residence in Persia under this Treaty, would be denied the benefit of Article III in case they acquired a domicile in Persia. The provision contemplated residence, nothing is said to indicate that domicile is excluded, and the clear import of the provision is that, so long as they retained their status as citizens of the United States, they would be entitled to the guaranty of Article III. The same would be true of Persians permitted to reside here under the Treaty.

Again, the provisions of Article V of the Treaty were of special importance, as they provided for extraterritorial jurisdiction of the United States in relation to the adjudication of disputes.[1] It would thwart the major

---

[1] "Article V. All suits and disputes arising in Persia between Persian subjects and citizens of the United States, shall be carried before the Persian tribunal to which such matters are usually referred at the place where a consul or agent of the United States may reside, and shall be discussed, and decided according to equity in the presence of an employé of the consul or agent of the United States.

"All suits and disputes which may arise in the empire of Persia between citizens of the United States, shall be referred entirely for trial and for adjudication to the consul or agent of the United States residing in the province wherein such suits and disputes may have

purpose of the Treaty to exclude from the important protection of these provisions citizens of the United States who might be domiciled in Persia. The test of the application of every paragraph of Article V, with respect both to citizens of the United States and to Persian subjects, clearly appears to be that of nationality, irrespective of the acquisition of a domicile as distinguished from residence.

We find no warrant for a more restricted interpretation of the words " a citizen or subject of either of the contracting parties " in Article VI than that which must be given to the similar description of persons throughout the other articles of the Treaty. The same intention which made nationality, without limitation with respect to domicile, the criterion in the other provisions, dominates this provision. The provision of Article VI is reciprocal. The property of a Persian subject dying within the United States, leaving no kin, is to be dealt with in the same manner as the property of a citizen of the United States dying in Persia in similar circumstances.

---

arisen, or in the province nearest to it, who shall decide them according to the laws of the United States.

"All suits and disputes occurring in Persia between the citizens of the United States and the subjects of other foreign powers, shall be tried and adjudicated by the intermediation of their respective consuls or agents.

" In the United States, Persian subjects, in all disputes arising between themselves, or between them and citizens of the United States or foreigners, shall be judged according to the rules adopted in the United States respecting the subjects of the most favored nation.

" Persian subjects residing in the United States, and citizens of the United States residing in Persia, shall, when charged with criminal offences, be tried and judged in Persia and the United States in the same manner as are the subjects and citizens of the most favored nation residing in either of the above-mentioned countries."

It is not necessary to invoke the familiar rule with respect to the liberal construction of treaties,[2] as the instant case merely calls for a reading of the provision as to "citizens" and "subjects" according to its terms. There is no applicable principle which permits us to narrow them. As treaties are contracts between independent nations, their words are to be taken in their ordinary meaning "as understood in the public law of nations." *Geofroy* v. *Riggs,* 133 U. S. 258, 271.

There can be no question as to the power of the Government of the United States to make the Treaty with Persia or the Consular Convention with Italy. The treaty-making power is broad enough to cover all subjects that properly pertain to our foreign relations, and agreement with respect to the rights and privileges of citizens of the United States in foreign countries, and of the nationals of such countries within the United States, and the disposition of the property of aliens dying within the territory of the respective parties, is within the scope of that power, and any conflicting law of the State must yield. *Hauenstein* v. *Lynham,* 100 U. S. 483, 489; *Geofroy* v. *Riggs, supra,* at p. 266; *Missouri* v. *Holland,* 252 U. S. 416, 434; *Sullivan* v. *Kidd,* 254 U. S. 433, 440; *Asakura* v. *Seattle,* 265 U. S. 332, 343; *Todok* v. *Union State Bank,* 281 U. S. 449, 453.

Our conclusion is that, by virtue of the most-favored-nation clause of Article XVII of the Consular Convention between the United States and Italy of 1878, the Italian Consul General was entitled in the instant case, being that of the death of an Italian national in this country prior to the termination of the Treaty between the United

---

[2] *Hauenstein* v. *Lynham,* 100 U. S. 483, 487; *Geofroy* v. *Riggs,* 133 U. S. 258, 271; *Tucker* v. *Alexandroff,* 183 U. S. 424, 437; *Asakura* v. *Seattle,* 265 U. S. 332, 342; *Jordan* v. *Tashiro,* 278 U. S. 123, 127; *Nielsen* v. *Johnson,* 279 U. S. 47, 52.

States and Persia of 1856, to the benefit of Article VI of that Treaty, and that the net assets of the decedent should be delivered to him accordingly.

The decree is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*