BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, acting as the Dade County Port Authority, Appellant,

v.

AEROLINEAS PERUANASA, S. A., et al., Appellees.

AEROLINEAS PERUANASA, S. A., et al., Appellants,

v.

BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, acting as the Dade County Port Authority, Appellee.

BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, acting as the Dade County Port Authority, Appellant,

v.

LINEAS AEREAS DE NICARAGUA, S. A., Appellee.

LINEAS AEREAS DE NICARAGUA, S. A., Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, acting as the Dade County Port Authority, Appellee.

Nos. 19476, 19632.

United States Court of Appeals
Fifth Circuit.

Aug. 31, 1962.

Chester Bedell, Jacksonville, Fla., Thomas G. Spicer, Asst. Gen. Counsel, Dade County Port Authority, Paul G. Hyman, Miami, Fla., for appellant.

Philip Schleit, Washington, D. C., J. Leo McShane, Miami, Fla., Davis W. Morton, Jr., Washington, D. C., for appellees.

Jackson L. Peters, Miami, Fla., for British Overseas Airways Corp., British West Indian Airways Ltd., Bahamas Airways Ltd., and KLM Royal Dutch Airlines, amici curiae.

Before TUTTLE, Chief Judge, BELL, Circuit Judge and CARSWELL, District Judge.

GRIFFIN B. BELL, Circuit Judge.

These consolidated appeals are from final decrees of the District Court holding that appellant may not charge the foreign airlines according to its usual schedule of charges for landing and other aviation fees and for fees paid concessionaires by the appellees and in turn paid to appellant, but must give them the benefit of lower charges to which four others are entitled by virtue of contracts. The decrees also awarded judgments for the amount of the excess charges paid by appellees and their suppliers since 1955, together with interest.[1]

Appellant owns and operates the Miami International Airport. Appellees are ten Latin American airline corporations and have made substantial use of the airport facilities in international operations during recent years. Their cause of action is premised on Article 15 of the provisions of the Convention on International Civil Aviation, the "Chicago Convention", which became effective as a treaty between the ratifying states on April 4, 1947. 61 Stat. 1180. This treaty was ratified by the United States of America and by, among others, the countries of which appellees are nationals. The Republic of Panama did not ratify the treaty until January 18, 1960, but appellee Aerovias Interamericanas de Panama, S.A., relies on an executive agreement between the Republic of Panama and this country which became effective April 14, 1949 and which, for the purpose of this case, is as effective as the Chicago Convention.

That Convention provided, in setting out principles and arrangements for the development of International Civil Aviation on the Basis of equality of opportunity, as follows: (Article 15)

"Any charges that may be imposed or permitted to be imposed by a contracting State for the use of such airports and air navigation facilities by the aircraft of any other contracting State shall not be higher,

"(a) As to aircraft not engaged in scheduled international air services, then those that would be paid by its national aircraft of the same class engaged in similar operations, and

"(b) As to aircraft engaged in scheduled international air services, than those that would be paid by its national aircraft engaged in similar international air services."

1. The memorandum opinion of the District Court in case No. 19,476 is reported in 197 F.Supp. 230 to which reference is made for a detailed statement of the facts here involved. The court entered finding of facts and conclusions of law in case No. 19,632. The cases were consolidated for consideration by this court.

The District Court construed this article in a favored nation clause concept, but refused to consider it on the basis of determining the presence or absence of discrimination. It was treated as being an absolute requirement to the end that charges against appellees could be no higher than the lowest charges or rates paid by American nationals, no matter what the classification or circumstances. We disagree and reverse.

The dispute centers around the fact that two separate schedules of charges were effective at the airport; one schedule being based on contracts made at or near the time the airport opened for business in 1946, and the other being based on Resolution No. 56 of appellant setting charges applicable to all aircraft except those of the companies who entered into the contracts. The facts are not in dispute and our decision turns on the construction of the Chicago Convention treaty in light of the undisputed facts.

At the close of World War II, Pan American Airways, Inc. owned the 36th Street Airport near the City of Miami in Dade County, Florida, embracing 223 acres of land. The United States of America owned the adjacent Convair property consisting of 102 acres and both tracts were improved by various airport facilities. Eastern Airlines, Inc., Delta C & S Airlines, Inc. and National Airlines, Inc. were using the facilities of the 36th Street Airport under an arrangement with Pan American. Only Pan American was flying internationally.

The Board of County Commissioners of Dade County was authorized by the Florida Legislature in 1945 to establish airport facilities to be financed by ad valorem taxation on property within the county, and by revenue bonds payable solely from the revenues of any facility established. Pursuant to this statutory authority, the county commissioners acting as the Dade County Port Authority issued twenty year bonds in the municipal amount of $2,500,000 payable only from anticipated revenues. These were exchanged with Pan American Airlines, Inc. for a deed to the 36th Street Airport. Appellant simultaneously borrowing

$700,000 from Eastern Airlines with which to purchase the Convair property. This vested title to an existing 325 acre airport in appellant with no cash outlay. At the same time appellant entered into contracts with Pan American and Eastern whereunder Pan American leased a portion of the airport for the term of the revenue bonds and Eastern leased the Convair property for the same term. Pan American and Eastern, because of the indebtedness of the Authority, were committed to the airport from the beginning but leases were also tendered to other airlines at the same time. National, Delta, and Taca Airways Agency, Inc., a corporation of El Salvador engaged in international service, all accepted identical twenty year leases with the amount of rent depending on space taken. Each lease contract provided that appellant and the lessees would share in the profits of the airport, and sustain it in losses for as long as appellant desired to be so sustained. The contracts required appellants to provide without expense to lessees the necessary facilities for governmental agencies such as the weather bureau, health services, and immigration and customs. Each lease set forth the same schedule of aviation fees to be charged, based on a graduated scale for flights scheduled, plus landing weight of the aircraft. The lessees and their suppliers were not to be otherwise charged for the use of the airport facilities. Each contract provided that the Authority could redeem the bond issue at any time and in such event the provision of the contracts providing for the sharing of profits and losses would become ineffective. Each lessee had the option of continuing under the contracts, save for that part, or of entering into a new ten year lease calling for rentals and airport charges comparable to those charged by comparable United States airports.

Appellant commenced operations at the airport on March 23, 1946 with a small staff, offering domestic service only. A schedule of charges applicable to airlines who did not commit themselves to the long term contract was published at that time. On September 24, 1956 appellant adopted Resolution No. 56 setting forth

a permanent schedule of charges applicable to all aircraft using the facilities except aircraft of the lessees under the contracts. Appellees commenced using the facilities thereafter, one as early as 1948, and another as late as 1960, and were charged on the basis of Resolution No. 56. These charges exceeded those paid by the lessees in respect to landing charges and included the following, none of which were required of the twenty year lessees: passenger terminal charges, cargo terminal charges, and concessionaire charges, imposed on the supplier and passed on to appellees, based on five per cent of the gross sales price of gasoline, oil and meals purchased by appellees.

The growth of the airport was rapid and after little more than a year of operations appellant redeemed the original bond issue with part of the proceeds of a new issue. The profit and loss sharing arrangement under the contracts was terminated and the five contracting airlines elected to continue the use of the facilities for the remaining almost eighteen years under the favorable schedule of charges under the contracts, rather than entering into new ten year leases whereunder the charges would have been increased.

The facilities of the airport were greatly expanded and finally in 1955 it was moved to a new location. The contracts of the five original lessee airlines will expire December 31, 1965. In the meantime, Taca terminated services to Miami and its contract was mutually cancelled.

The background facts demonstrate that various airlines, other than those having the original contracts, have long been dissatisfied with the charges under Resolution No. 56 in view of the lower charges under the contracts. For example, Pan American on behalf of its subsidiary corporation, Cubana de Aviacion S.A., sought to obtain for it the rates afforded to Pan American under the contract. The matter was arbitrated and the contention of Pan American for Cubana was rejected.[2]

Complaints against the charges filed by KML Royal Dutch Airlines and British South American Airways, Inc. in 1949 were denied, as well as the complaint filed in 1955 by Braniff International Airways, Inc., a United States airline flying internationally. Braniff has paid the same charges as those paid by appellees, all under the provisions of Resolution No. 56. All are engaged in international operations. Only Pan American of the original five lessees is now engaged in international operations. National was for some years but discontinued after the Cuban upheaval.

Some of appellees sought relief, to no avail, from the Civil Aeronautics Board and the Civil Aeronautics Authority in 1955. The claim then was based on discrimination which the administrator of Civil Aeronautics noted would terminate with the expiration of the twenty year contracts—December 31, 1965.[3]

---

2. Cubana, along with two other Cuban airlines were plaintiffs in this action but the court granted no direct relief to any of the three because of the "rapidly changing political situation in the Republic of Cuba," simply retaining jurisdiction as to the three.

3. The administrator of Civil Aeronautics, in pertinent part, replied:
"In your letter it is alleged that the Dade County Port Authority, which owns and operates the Miami International Airport, is unjustly discriminating against all carriers using that airport other than Pan American World Airways, Eastern Air Lines, Delta C & S Air Lines, and National Airlines (hereinafter referred to as the 'sustaining airlines') because of differences in the rates and charges imposed against those four carriers and those imposed against all other carriers for the use of the landing area and other public use areas and facilities of the airport. * * *
" * * * the differential in rates and charges imposed against the sustaining airlines for the use of the landing area and other public use areas and facilities of the Miami International Airport and those imposed against all other carriers for use of such areas and facilities does not constitute unjust discrimination against such other carriers, within the

■ The private rights of appellees with which we are concerned arise under the Treaty, Edye v. Robertson, 1884, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798, and include benefits from most favored nation clauses. Santovincenzo v. Egan, 1931, 284 U.S. 30, 52 S.Ct. 81, 76 L.Ed. 151. And in construing the treaty, as other contracts, we give consideration to the intent of the parties so as to carry out their manifest purpose. Wright v. Henkel, 1903, 190 U.S. 40, 23 S.Ct. 781,

meaning of the provisions of the grant agreements between the Dade County Port Authority and this Agency which obligate the Port Authority to operate the airport for the use and benefit of the public, on fair and reasonable terms and without unjust discrimination. * * *

"The rates and charges now being imposed against the sustaining airlines are those that were fixed by agreements entered into between the Port Authority and those airlines in 1945. In view of the pertinent circumstances prevailing at that time, it is the view of this Agency that the Port Authority acted reasonably in entering into such agreements, which, by their terms, were binding on the parties thereto for a term of 20 years.

"In reaching this conclusion we have taken into consideration, among other things, (1) the provision in each of the agreements which, in effect, constituted an underwriting of the bonds then being issued by the Port Authority to finance the acquisition from Pan American Airways of the Miami airport; (2) the fact that in order to market the bonds it was necessary at that time for the Authority to provide some type of security other than the then anticipated but unknown revenues, such as was provided in the underwriting of the bond issue by the sustaining airlines; (3) the fact that the schedule of landing fees and charges prescribed in the original lease agreements with the sustaining airlines compares favorably with landing fees and charges at other comparable airports in effect at that time; (4) the fact that similar agreements were offered to all other carriers then operating on the Miami International Airport; and (5) the fact that it was not unusual in 1945 for an airport owner to enter into agreements with airlines providing for the leasing of space on the airport and the use of the landing facilities at prescribed rentals and landing fees and charges, for terms of 15, 20 and 25 years. * * *

"Our study of the matter has also disclosed that the rates and charges now being imposed against all carriers and their suppliers, other than the sustaining airlines and their suppliers, compare favorably with the rates and charges now being imposed at other comparable airports. It is our opinion that such rates

and charges are fair and reasonable in the light of all pertinent circumstances now prevailing.

"The unjust discrimination provisions incorporated in grant agreements pursuant to the Federal Airport Act, in our opinion, do not require that the airport owner refrain from charging users of the airport, rates higher than those to which other users of the same class are entitled under previously executed contracts which were reasonable when executed (see Trans World Airlines, Inc. v. City and County of San Francisco, U.S.C.A. 9th, Dec. 19, 1955, 228 F.(2d) 473, 4 Avi. 17, 866, cert. den [351 U.S. 919, 76 S.Ct. 711, 100 L.Ed. 1451] April 30, 1956).
* * *

"Insofar as concerns the landing fees and charges to be imposed against the sustaining airlines after December 31, 1965, it is to be noted that the 1955 amendatory agreements between those airlines and the Port Authority which revised and extended the 1945 agreements provide that such landing fees and charges will be renegotiated six months prior to the expiration of the original terms of the agreements, in the light of the circumstances then prevailing. Under this provision, it appears that the Port Authority will be in a position to negotiate landing fees and charges to be imposed against the sustaining airlines after December 31, 1965, that are then in substantial conformity with those then imposed against all other carriers.
* * * * *

"In this connection, your attention is invited to Resolution No. 11144 of the Board of County Commissioners of Dade County, Florida, acting as the Dade County Port Authority, adopted February 14, 1957, wherein the Port Authority warranted that on or before December 31, 1965 it will 'review its entire schedule of rates, tariffs, fees, and charges for users of airport facilities of the Authority, in all respects, in the light of circumstances and of facts that then and there exists, and, where necessary, modify, revise, or change said rates, tariffs, fees, and charges, so that they will then and there meet the legal requirements of being fair, reasonable, and not unjustifiably discriminatory or otherwise contrary to law.' * * * *"

47 L.Ed. 948; The Yulu, 5 Cir., 1934, 71 F.2d 635, cert. den., The Yulu v. U. S., 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 684; and Hidalgo County Water Control & Imp. Dist., etc. v. Hedrick, 5 Cir., 1955, 226 F.2d 1. We proceed also under the admonition that where a treaty admits of two constructions, one restrictive of and the other favorable to rights claimed under it, the latter is to be preferred. De Geofroy v. Riggs, 1889, 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642; Asakura v. Seattle, 1924, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041; Jordan v. K. Tashiro, 1928, 278 U.S. 123, 49 S.Ct. 47, 73 L.Ed. 214; and Bacardi Corp. of America v. Domenech, 1940, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98.

The clear purpose of the treaty here was to develop international civil air transport services on the basis of equality of opportunity. The contracting nations agreed to apply their laws and regulations to the aircraft of all contracting states without distinction as to nationality. A permanent organization was established under the treaty to further its purposes, including the avoidance of discrimination between the contracting nations. Each airport in the contracting nations open to public use for aircraft of its nationals was to be open under uniform conditions to the aircraft of the other contracting nations.

■■ There is nothing whatever in the treaty that would deprive the contracting airlines here of the fruits of their bargain, made before the treaty became effective, nor that would require appellant to afford the same bargain to appellees.[4] Appellees, on the other hand, have at all times been afforded uniform conditions. The same charges were made against them as against Braniff, an American national flying internationally. They were a part of the same class for the purpose of charges and the contracting airlines, upon the expiration of the twenty year contracts, will join that class. The present separate classifications of the two groups will then cease to exist and Article 15 of the treaty will become fully effective.

That this is a clear import of the treaty is demonstrated by Article 82 thereof which recognizes outstanding inconsistencies, and requires the use of best efforts by the contracting states to secure the termination of any such inconsistency:

"The contracting States accept this Convention as abrogating all obligations and understandings between them which are inconsistent with its terms, and undertake not to enter into any such obligations and understandings. A contracting State which, before becoming a member of the Organization has undertaken any obligations toward a non-contracting State or a national of a contracting State or of a non-contracting State inconsistent with the terms of this Convention, shall take immediate steps to procure its release from the obligations. If an airline of any contracting State has entered into any such inconsistent obligations, the State of which it is a national shall use its best efforts to secure their termination forthwith and shall in any event cause them to be terminated as soon as such action can lawfully be taken after the coming into force of this Convention."

Of course, the treaty was effective immediately except as to these inconsistencies but its terms, insofar as applicable here, would not become completely effective until the termination of these outstanding contracts, either at the in-

---

4. Although it is not a point urged, we note that these contracts were executed after the negotiation of the treaty in 1944 but before it became effective in 1947. With respect to private rights, unlike rights of the governments involved, a treaty is effective only from the exchange of ratifications and does not relate back to effect private rights vested prior to that date. Haver v. Yaker, 1870, 9 Wall. 32, 19 L.Ed. 571.

stance of this government or upon the expiration of the terms of the contracts. Cf. De Geofroy v. Riggs, supra, where the treaty with France permitted aliens of either country to inherit from citizens of the other, and the president of this country was to urge changes in inconsistent state laws. The treaty was effective immediately in states with consistent laws.

■ Appellees cannot rely in the courts on what was to be done in the future by this government to remove infraterritorial inconsistencies such as these contracts. This is a matter that addresses itself to the political branch of the government. Foster and Elam v. Neilson, 1829, 2 Pet. 253, 7 L.Ed. 415 and Robertson v. General Electric Co., 4 Cir., 1929, 32 F.2d 495. Thus, it is that appellees will have no cause of action under the treaty until the contracts in question are terminated, or until they expire by their own terms.

■ But there is yet another reason why this cause fails. Favored nation clauses may be inapplicable in situations where exceptions are made for valuable consideration. Bartram v. Robertson, 1887, 122 U.S. 116, 7 S.Ct. 1115, 30 L.Ed. 1118; Whitney v. Robertson, 1888, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386; and Kelly v. Hedden, 1888, 124 U.S. 196, 8 S.Ct. 459, 31 L.Ed. 389. The compelling logic of these cases is persuasive if not controlling in this regard, and we adopt it as controlling here.

Plaintiffs in Bartram were importers of sugar from a Danish possession. They sought a refund of duties paid on the sugar under protest because of a favored nation clause in a treaty between this country and Denmark. This country entered into a treaty with the King of the Hawaiian Islands after the effective date of the treaty with Denmark whereunder the United States agreed to admit, duty free, certain products of the Hawaiian Islands as an equivalent for an agreement by the King to admit certain products, duty free, from the United States into the Hawaiian Islands and for the concession by the King that during the term of the treaty he would not lease or otherwise dispose of any port or other territories in his domain or grant any special privileges thereto to any other government, or make any treaty by which any other nation would obtain the same privileges relative to duties thereby secured to the United States. The court stated that the favored nation clause in the treaty with Denmark did not cover concessions like those made to the Hawaiian Islands for valuable consideration. Whitney v. Robertson and Kelly v. Hedden involved the same question as it related to duty on sugar from the Dominican Republic and a treaty with that country. The court reiterated that the favored nation clause was not intended to interfere with special arrangements upon sufficient consideration with other countries.

These well reasoned authorities, involving as they do private rights based on favored nation clauses, are analogous to the instant situation. Considered together, they teach that there may be exceptions to such clauses where based on valuable considerations. Such consideration was present here. Such is the case here. The five airlines with the original contracts joined with appellant to establish and sustain the airport in its infancy. By hindsight it can be said that they received a bargain, but the facts nevertheless show ample consideration. The contracts subsist and so long as they do, appellees cannot complain.

Having taken this view of the case, we do not reach the question of the use of a sliding or graduated scale of landing fees which appellees urge as being unjustifiable, nor the remaining defenses asserted by appellant.

Judgments should have been entered in the District Court for appellant. We reverse and remand so that this may be done.