Ralph D. HARRIS and Joan F. Harris,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 84–8424.

United States Court of Appeals,
Eleventh Circuit.

Aug. 14, 1985.

Michael L. Paup, Chief, Appellate Section, Glenn L. Archer, Jr., Asst. Atty. Gen., David English Carmack, Washington, D.C., for defendant-appellant.

David J. Kiyonaga, Jacksonville, Fla., Darrell F. Brown, Little Rock, Ark., for plaintiffs-appellees.

Dwight A. McKabney, Miami, Fla., Allan I. Mendelsohn, Marvin L. Szymkowicz, Washington, D.C., for amicus curiae Wm. & Vivian De La Mater, et al.

Before KRAVITCH and CLARK, Circuit Judges, and WRIGHT[*], Senior Circuit Judge.

EUGENE A. WRIGHT, Circuit Judge:

During 1979, Ralph and Joan Harris resided in the territory within the Republic of Panama that formerly constituted the Canal Zone. They worked for and received a salary from the Panama Canal Commission (PCC). They filed a joint federal income tax return and paid taxes allegedly due. In 1980, the Harrises filed a refund claim for

[*] Honorable Eugene A. Wright, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

excess taxes ,of $6,647 paid in 1979. The claim constituted taxes assessed on wages earned from the PCC from October 1 to December 31, 1979. The Internal Revenue Service (IRS) disallowed the claim.

The basis for taxpayers' refund claim is Article XV of the Agreement in Implementation of Article III of the Panama Canal Treaty (Agreement). Taxpayers assert it exempts U.S. citizens from taxation of income derived from their PCC employment. The government construes the Agreement as allowing an exemption only from Panamanian taxation.

The Harrises initiated this civil lawsuit in the district court for the Southern District of Georgia, where they then resided. On cross-motions for summary judgment, the court granted the plaintiffs' motion and entered judgment against the government for the amount sought, plus interest. 585 F.Supp. 862 (S.D.Ga.1984). We affirm.

## PANAMA CANAL TREATY

Pursuant to treaty adopted in 1903, the United States constructed the Panama Canal. Isthmian Canal Convention, T.S. No. 431, 33 Stat. 2234 (Nov. 18, 1903). The treaty granted to the United States "the rights, powers and authority ... which the United States would possess and exercise if it were the sovereign of the territory...." *Id.*, Article III.

On September 7, 1977, the United States and Panama signed a second Panama Canal Treaty, T.I.A.S. No. 10030, which became effective on October 1, 1979. *See* 22 U.S.C. §§ 3601–3871 (West Supp.1985). It restored to Panama territorial sovereignty over the Canal Zone and granted to the U.S. the right to manage, operate and maintain the canal until the year 2000. The PCC is the agency through which the United States manages canal operations. *Id.*, § 3611.

Because sovereignty was being transferred from the U.S. to Panama, it was imperative to define the rights and legal status of PCC employees. Article III, paragraph 9, provides that:

the rights and legal status of the United States Government agencies and employees operating in the Republic of Panama pursuant to this Article, shall be governed by the Agreement in Implementation of this Article, signed this date.

The issue before the court concerns interpretation of paragraph two of Article XV of the Agreement. Article XV, which governs taxation of the PCC, its contractors and subcontractors, and its U.S. citizen employees and their dependents, is quoted in its entirety.

### Taxation

1. By virtue of this Agreement, the Commission, its contractors and subcontractors, are exempt from payment in the Republic of Panama of all taxes, fees or other charges on their activities or property.

2. United States citizen employees and dependents shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the Commission. Similarly, they shall be exempt from payment of taxes, fees or other charges on income derived from sources outside the Republic of Panama.

3. United States citizen employees and dependents shall be exempt from taxes, fees or other charges on gifts or inheritance or on personal property, the presence of which within the territory of the Republic of Panama is due solely to the stay therein of such persons on account of their or their sponsor's work with the Commission.

4. The Coordinating Committee may establish such regulations as may be appropriate for the implementation of this Article.

Historically, U.S. citizens employed by the Canal Zone received favorable tax treatment. Until 1951, income earned by U.S. citizens employed by the Panama Canal Company or the Panama Canal Zone government was totally exempt from federal income taxation. Beginning in 1951, the income of those persons was taxed by this

government at a lower effective tax rate than mainland taxpayers.

## MOTIONS TO STRIKE

By motion on October 19, 1984, the appellees moved to strike footnotes 18 and 19 of the government's opening brief alleging lack of foundation, irrelevancy, incompetency and immateriality.[1]

Although the government did not request leave of court to file extra-record materials, it filed a diplomatic note from the Panamanian Government on March 1, 1985. This late filing of extra-record evidence prompted a second motion to strike by appellees. Therein, they challenged the manner in which the diplomatic note was prepared and presented to us.

The government opposed the motions, citing Supreme Court practice in this area of international diplomacy, which calls for supplementing the record with any material that might aid in treaty interpretation.

We shall dispense with the need for a formal order granting the motions.[2] We shall not consider the challenged material and we reject the government's suggestion that self-serving evidence outside the record, for which additional explanation is required, can be considered by this court.[3] *See United States v. Oakley,* 744 F.2d 1553, 1556 (11th Cir.1984) (per curiam) (appellate court reviewing grant of summary judgment can review only matters presented to the district court); *Mitchell v. Trade Winds Co.,* 289 F.2d 278, 279 (5th Cir.1961) (Labor Dept. files not in evidence before district court rejected on appeal). *But cf.*

*Dickerson v. Alabama,* 667 F.2d 1364, 1367 & n. 5 (11th Cir.) (appellate court has inherent equitable powers to supplement the record to include state court trial transcript in habeas corpus action), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).

## STANDARD OF REVIEW

 In reviewing the grant of summary judgment, an appellate court must apply those legal standards that control the district court's determination. *Mercantile Bank & Trust Co., Ltd. v. Fidelity and Deposit Co.,* 750 F.2d 838, 841 (11th Cir. 1985); *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981). The appellate court may review only matters presented to the trial court. *Oakley,* 744 F.2d at 1556.

 We apply the same rules of treaty interpretation to executive agreements implementing treaty provisions. Clear language controls unless it " 'effects a result inconsistent with the intent or expectations of its signatories.' " *See Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (quoting *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963)). While possessing the force and effect of law, international agreements should be construed more like contracts than statutes. *See Santovincenzo v. Egan,* 284 U.S. 30, 40, 52 S.Ct. 81, 84, 76 L.Ed. 151 (1931) (international agreements are contracts between foreign states).

---

1. Footnote 18 of appellant's brief states:
 We are informed that the Government of the Republic of Panama has never expressed any difference of opinion with respect to the position taken by the United States with respect to the domestic taxation of United States citizens who are employed by the Commission.
 Footnote 19 states:
 Significantly, the official Panama Government publication of the texts of the Canal Treaties and related agreements, entitled *Tratados Del Canal de Panama* (1980), indicates that the Republic of Panama shares the United States' view that the exemptions in paragraph 2 of Article XV apply only to Panamanian taxes. The index of that publication (at 313) contains a heading entitled 'IMPUESTOS

(Republica de Panama)' (TAXES (Republic of Panama)) and lists thereunder, *inter alia,* 'Exenciones a los empleados ciudadanos de los Estados Unidos y sus dependientes por razon de su trabajo' (Exemptions to the United States citizen employees and their dependents by reason of their work) Ac—III, Art. XV, pars. 2, 3. No mention is made of exemption from United States taxation.

2. *Appellees' request for costs and expenses in bringing their motions is denied.*

3. At oral argument, counsel for the government conceded that this case may be decided on the record.

## TAX EXEMPTION ISSUE

The issue before the court is one of first impression in this circuit. Lower courts generally have held for the government on this issue.[4] Recently, the Federal Circuit reversed the 46-page opinion for the taxpayers by Claims Court Chief Judge Kozinski. *Coplin v. United States*, 761 F.2d 688 (Fed.Cir.1985), *rev'g*, 6 Cl.Ct. 115 (1984). Appellees in the present case are supported by a group of similarly situated taxpayers as amici curiae, some of whom were appellees in the *Coplin* case.[5]

Our disagreement with the Federal Circuit concerns the admissibility of the diplomatic note submitted to both courts just before oral argument. The Federal Circuit accepted the note. *See Coplin*, 761 F.2d at 691 (denying appellees' motions to strike diplomatic note and cable from U.S. Embassy in Panama). Appellees' petitions for rehearing which attacked the note's reliability were denied.[6]

In *Coplin*, the Claims Court construed paragraph two literally because the United States government presented no statement of the official Panamanian position. *See* 84–2 U.S.Tax Cas. (CCH) at 85,002. Chief Judge Kozinski suggested that the absence of a diplomatic note hurt the government's position. *Id.* at 85,003 (drawing a negative inference from the government's refusal to produce evidence of Panamanian intent).

For the Federal Circuit, the diplomatic note and letters delivered to the panel the day of oral argument were dispositive. *See* Additional Views of Judges Bissell and Smith, 761 F.2d at 692. However, the records in *Coplin* and *Harris* are different. We reject the matters that were not presented to the lower court. On our record, the taxpayers must prevail.

### a. The Language

The district court placed determinative reliance on the "unmistakably clear" language of paragraph two of Article XV. Judge Bowen wrote, "I read this paragraph as being subject to or needful of no interpretation. It says what it says." 585 F.Supp. at 863. Rejecting the government's legislative history, the court wrote: "It would take a higher intellect than mine to construe confusion where there is so much clarity in the language utilized." *Id.*, unnumbered footnote.

Paragraph two of Article XV speaks in clear and sweeping terms. It provides that U.S. citizen employees of the PCC *"shall be exempt from any taxes*, fees, or other charges on income received as a result of their work for the Commission" (emphasis added). The government concedes that a broad exemption from domestic taxation exists if the language is given its literal effect. It asserts, however, that such an

---

**4.** *Rego v. United States*, 591 F.Supp. 123 (W.D. Tenn.1984); *Stabler v. United States*, 84–1 U.S.Tax Cas. (CCH) ¶ 9153 (N.D.Tex.1983); *Hollowell v. United States*, 84–1 U.S.Tax Cas. (CCH) ¶ 9142 (M.D.Fla.1983); *Pierpoint v. United States*, 83–2 U.S.Tax Cas. (CCH) ¶ 9647 (D.S.C. 1983); *Snider v. United States*, 53 A.F.T.R.2d 349 (W.D.Wash.1983); *Stokes v. United States*, 83–2 U.S.Tax Cas. (CCH) ¶ 9644 (W.D.Wash.1983); *Long v. United States*, No. 83–158 (D.Or. July 22, 1983); *Swearingen v. United States*, 565 F.Supp. 1019 (D.Colo.1983); *Watson v. United States*, 592 F.Supp. 701 (W.D.Wash.1983); *Corliss v. United States*, 567 F.Supp. 162 (W.D.Ark.1983); *Highley v. United States*, 574 F.Supp. 715 (M.D. Tenn.1983); *Vamprine v. Commissioner*, T.C.M. (CCH) 1984–624; *Smith v. Commissioner*, 83 T.C. 702 (1984); *Collins v. Commissioner*, T.C.M. (CCH) 1983–762; *McCain v. Commissioner*, 81 T.C. 918 (1983).

 *Contra Harris v. United States*, 585 F.Supp. 862 (S.D.Ga.1984); *Coplin v. United States*, 6 Cl.Ct. 115 (1984), *rev'd*, 761 F.2d 688 (Fed.Cir. 1985).

**5.** Taxpayers were represented at oral argument by counsel for the taxpayers in the *Coplin* case. Amici were represented in this appeal by the former General Counsel for the Panama Canal Commission.

**6.** Taxpayers noted the suspicious introduction of this evidence due to a recent $40 million gift to the Panamanian government whose administration had changed in October 1984. Taxpayers further attacked the "strangely identical" letters attached to the note from persons who were not active negotiators of the provision in question. Lastly, the appellees in *Coplin* suggested that the note could not be considered as evidence of intent in September 1977. At best, it showed intent as of February 1985.

interpretation is achieved only by wrenching the words out of context. We disagree.

In contrast to the all-inclusive language found in paragraph two, paragraph one establishes an exemption *for the Commission itself*, limited "to payment in the Republic of Panama of all taxes". Paragraph three, dealing with personal property, gift and inheritance taxes of U.S. citizen employees, contains an identical limitation. It provides that the presence of the property of Americans "within the territory of the Republic of Panama shall not give rise to the exercise of taxing jurisdiction."

The absence of limiting language in paragraph two, in contrast to paragraphs one and three, demonstrates that "exempt from any taxes" meant just that. Paragraph two was not intended to create an exemption only from payment of Panamanian taxes. The presence of the specific limiting language in paragraphs one and three is persuasive evidence that the absence of similar language in paragraph two was intentional.

The government contends, however, that the presence of the limiting language in paragraphs one and three shows that such language also was intended to be used in paragraph two, except that it was omitted by inadvertence or oversight. This assumes that the government was represented by an inexperienced negotiating team whose drafting errors now need rectification. That was not the case. It was represented by a distinguishèd negotiating team, obviously aware that the Treaty was a foreign policy mission of the highest magnitude.

Reviewing other taxation provisions of the Treaty package, we find specific references to Panamanian taxation. For example, paragraph 9 of Article IX provides that vessels passing through the Canal "shall be exempt from any taxes ... by the Republic of Panama." Similarly, paragraph 2(e) of Article XI of the Agreement provides that U.S. PCC contractors "shall not be obliged to pay any tax ... to the Republic of Panama" provided they are taxed in the U.S. at a substantially equivalent rate. As noted by Judge Kozinski in *Coplin*, "This is an agreement drafted by sophisticated parties, obviously capable of using precise language." 6 Cl.Ct. at 127.

The affidavit of Michael Kozak, State Department negotiator, indicates that the operative language of Article XV was taken from the standard Status of Forces Agreement (SOFA) negotiated between the U.S. and foreign countries in which U.S. armed forces members and employees are stationed. The SOFA language is virtually identical to the language of paragraph two of Article XV in the Agreement before us, except that in the second sentence an explicit reference is made to taxation "as is provided by Panamanian law":

> Members of the Forces or the civilian component, and dependents, shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the United States Forces or for any of the service facilities referred to in Article XI or XVIII of this Agreement. Similarly, *as is provided by Panamanian law*, they shall be exempt from payment of taxes, fees, or other charges on income derived from sources outside of the Republic of Panama.

Article XVI, Agreement in Implementation of Article IV of the Panama Canal Treaty, Sept. 7, 1977, T.I.A.S. No. 10032 (emphasis added).

Amici report that an earlier draft, dated June 26, 1977, of the tax exemption language at issue contained the reference to Panamanian law underscored above.[7] Again, deletion of qualifying language must be considered deliberate.

Moreover, tax exemption clauses are well known to the Treasury, Defense, and State Departments from other treaties. Given this depth of experience, we cannot accept the government's position that its negotiat-

---

**7.** At oral argument, counsel for the government suggested that the phrase "as is provided by Panamanian law," was dropped from the second sentence of paragraph two because it was merely "surplusage."

ing team adopted language that incorrectly expressed the intent of the Treaty signatories.

### b. *Legislative History and Treaty Negotiations*

■ As previously noted, clear treaty language controls unless it effects a result inconsistent with the intent and expectations of the signatories. *Sumitomo*, 457 U.S. at 180, 102 S.Ct. at 2377. Where language is susceptible to differing interpretations, extraneous materials bearing on the parties' intent should be considered. *Hidalgo County Water Control and Improvement District v. Hedrick*, 226 F.2d 1, 8 (5th Cir.1955), *cert. denied*, 350 U.S. 983, 76 S.Ct. 469, 100 L.Ed. 851 (1956); *Corliss v. United States*, 567 F.Supp. 162, 164 (W.D.Ark.1983). Here, we must consider the interests and intentions of both parties to the Treaty "to secure equality and reciprocity between them." *Jordan v. Tashiro*, 278 U.S. 123, 127, 49 S.Ct. 47, 48, 73 L.Ed. 214 (1928).

The district court had before it the affidavit of Dr. Carlos Alfredo Lopez Guevara, Ambassador Extraordinary and Plenipotentiary, who acted as the chief Panamanian negotiator. Guevara stated that the United States proposed the language of paragraph two without explanation, and the Panamanians accepted it without objection. Guevara said further that the language of paragraph two was intended to preclude both the United States and Panama from taxing American employees of the PCC, that it was so read by Panama, and that a contrary interpretation by the United States would be viewed as a material breach of the treaty. At oral argument, counsel for the government characterized Guevara's affidavit as personal statements "out of step" with his government.

Plaintiffs' summary judgment motion was supported also by sworn statements from Juan Antonio Tack, Minister of For-

eign Relations and head of the Panamanian negotiating staff between 1970 and 1976; and Demetrio B. Lakas, Panama's then President. Both said clearly that the language at issue created a tax exemption for U.S. citizen PCC employees in both countries. Tack's letter, interpreted from Spanish, stated: "The general spirit of such a provision was that the U.S. citizens working in the canal administration should be granted some type of economic incentive, in addition to their salaries, for obtaining the highest yield in their specialized functions."

In fact, many provisions of the Treaty secured PCC employees' rights and created special inducements for them to remain on the job.[8] Taxpayers' suggestion that a U.S. tax exemption was intended as part of the package of inducements is not unreasonable.

The only affidavit filed by the government in support of its summary judgment motion was that of Michael Kozak, Deputy Legal Advisor to the State Department. The Kozak affidavit undermines the government's position. Unlike Guevara, Kozak was not privy to the actual negotiations on the tax exemption issue.

Counsel for the government conceded in *Coplin* that the Kozak affidavit "may not be used to divine the purpose of Article XV." 6 Cl.Ct. at 132 n. 16. Several lower courts holding for the government relied on the unimpeached Kozak affidavit. *See, e.g., Stabler v. United States*, 84–1 U.S.Tax Cas. (CCH) ¶ 9153, at 81,185–86 (N.D.Tex.1983); *Pierpoint v. United States*, 83–2 U.S.Tax Cas. (CCH) ¶ 9647, at 88,329 (D.S.C.1983).

The government's reliance on the Senate hearings and Senate Report accompanying the Treaty also is misplaced. In its brief, the government quotes this interchange between Senator Richard Stone and Herbert J. Hansell, Legal Advisor to the State De-

---

**8.** For example, Article X, paragraph 10(b) creates an affirmative duty on the part of the U.S. to seek legislation which provides more liberal retirement benefits. Other provisions of the Agreement that favor PCC employees include: Article XII, Entry and Departure; Article XIII, Services and Installations; Article XIV, Licenses; Article XVI, Import Duties; Article XVIII, Claims; and Article XIX, Criminal Jurisdiction.

partment, who was testifying before the Senate Foreign Relations Committee:

> Senator STONE: I think it was article XV, section 1 that raised an interesting question. I will read it to you. 'By virtue of this agreement the Commission, its contractors and subcontractors are exempt from payment in the Republic of Panama of all taxes, fees, or other charges on their activities or properties.' Then, in No. 2, referring to U.S. citizen employees and dependents, it says, 'shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the Commission. Similarly, they shall be exempt from payments of taxes, fees, or other charges on income derived from sources outside the Republic of Panama.'
>
> Of course, when that was announced, the press reported the glee of the Zonians that they were now exempt from U.S. income tax. When Senator Glenn asked you, are there any words that you would like to see in the treaty, I was just asking myself, would you like to see the words, United States, in there somewhere?
>
> Mr. HANSELL. I am sorry to be a source of disappointment for the Panamanians, but obviously we are not entering into an agreement between the United States and Panama that would exempt U.S. citizens from U.S. tax. The purpose of this, of course, was to exempt them from Panamanian tax.
>
> \* \* \* \* \* \*
>
> Senator STONE. Wouldn't you think that we could put in the understanding that I suggested to you, the clarification of our interpretation which then, when ratified by the Congress, by the Senate, and deposited, would clarify that in a little more formal way than simple advices, since you don't want to put words back in the treaty through negotiation?
>
> Mr. HANSELL. The one comment I would have with respect to that, and this relates to a couple of other points, is that we are dealing now with an internal U.S. matter, not a matter between the United States and Panama. That is, we don't agree with Panama how we are going to tax our citizens. That is obviously an internal matter. I would hope we could find ways of dealing with internal matters other than as understandings.

*Panama Canal Treaties: Hearings Before the Committee on Foreign Relations*, 95th Cong., 1st Sess. 268 (1977).

Far from supporting the government, the colloquy underscores the significance of the government's failure to clarify Article XV(2). The Senator was concerned that the tax issue could spawn litigation and suggested clarification through one of several established diplomatic channels. Hansell rejected the suggestion and responded by characterizing it as an "internal matter" which the government would find a way to avoid.

Moreover, Senator Stone's suggestion that the taxation issue be clarified through an exchange of notes or an "understanding" comports with standard diplomatic negotiating practice. The day the Treaty was signed, there was an extensive exchange of notes between the two nations. These notes supplied additional clarification and assurances regarding many of the provisions covered in the Treaty documents. *See, e.g., Exchange of Notes Relating to Post Services*, Sept. 7, 1977, reprinted in S.Exec.Rep. 95–12, 95 Cong., 1st Sess. (1978), at 726. We find no note exchange pertaining to Article XV on taxation despite ample opportunity between September 1977 when the Treaty documents were signed and October 1979 when they became effective.

Nor does Senate Executive Report No. 95–12 provide competent evidence on intent of the parties to the Agreement. The government urges that we give great weight to the meaning ascribed to Article XV(2) by the federal department charged with the Treaty's negotiation and enforcement. It relies on the State Department's section by section analysis included in the Senate Foreign Relations Committee Report for such meaning.

However, in *Coplin,* the government conceded that the section by section analyses were prepared by Michael Kozak and Geraldine Chester, neither of whom were present at any negotiating session during which the substance of Article XV was discussed. The government conceded also that the analyses were prepared after the negotiations had been completed and the Treaty documents had been signed. *Coplin,* 6 Cl.Ct. at 128. We reject the government's attempt to establish intent through documents it prepared after the fact.[9] *Cf. Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) (remarks of a single legislator on the committee are not controlling on legislative history).

Again, many of the lower courts that ruled for the government on this issue relied on the unimpeached Senate Report. *See, e.g., Rego v. United States,* 591 F.Supp. 123, 124 (W.D.Tenn.1984); *Corliss,* 567 F.Supp. at 165–66; *McCain v. Commissioner,* 81 T.C. 918, 928–29 (1983). In sum, the competent affidavits and legislative history before the district court fully support the taxpayers' position that the parties intended a bi-national tax exemption.

### c. *Other Considerations*

The government contends erroneously that unrestricted U.S. taxation of income earned in Panama by Americans would mirror the pre-1977 *status quo.* As previously indicated, American citizen PCC employees historically were either free of U.S. tax (before 1951) or taxed at a reduced level (after 1951). We consider the tax treatment of PCC employees to be a unique situation. Appellees, therefore, are not subject to the fundamental principle of U.S.

tax law that the world-wide income of U.S. citizens is subject to taxation by this government regardless of the person's residence or the source of that income. *See Cook v. Tait,* 265 U.S. 47, 56, 44 S.Ct. 444, 445, 68 L.Ed. 895 (1924).[10]

Amici report that in 1974, only 88 Americans residing in Panama filed income tax returns. The total income of these Americans averaged about $32,000 and, according to Treasury Department estimates, produced about $600,000 of tax liability. Compared to the significant economic concessions made by this government as part of the Treaty package, the amount of potential tax revenues that would be lost through the exemption at issue may be considered slight.

Moreover, the number of Americans to benefit by a tax exemption is declining. Article III, paragraph 8, of the Treaty provides for "growing participation" of Panamanian nationals at all levels and areas of employment, with the objective of preparing, in an orderly fashion, for the assumption of full responsibility for Panamanian management of the canal in the year 2000.

In conclusion, we find that the clear language of Article XV(2) of the Agreement creates a bi-national tax exemption for PCC employees. The government has failed to produce competent evidence that Panama and the United States "intended to agree on something different from that appearing on the face of" Article XV of the Agreement. *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943) (Indian treaties). The government must live with the language it drafted.

AFFIRMED.

---

9. The dearth of evidence of negotiating history before *Coplin* was tried in the Claims Court may explain why lower courts generally have ruled for the government.

10. "Gross income" in Section 61 of the Internal Revenue Code of 1954 does not include income excluded "by any treaty obligation of the United States." 26 U.S.C. § 894(a) (1982). As the Supreme Court recognized in *Weinberger v. Rossi,* 456 U.S. 25, 29, 102 S.Ct. 1510, 1514, 71 L.Ed.2d 715 (1982), "The word 'treaty' has more than one meaning." We are persuaded that the phrase "treaty obligation" in Section 894 is broad enough to include executive agreements that are signed by the President pursuant to constitutional or statutory authority.