OPINION OF THE COURT
JORDAN, Circuit Judge.
This case is before us on remand from the Supreme Court, which vacated our earlier judgment that Appellant Carol Anne Bond lacked standing to challenge, on Tenth Amendment grounds, her conviction under the penal provision of the Chemical Weapons Convention Implementation Act of 1998, 18 U.S.C. § 229 (the “Act”), which implements the 1993 Chemical Weapons Convention, 32 I.L.M. 800 (1993) (the “Convention”). The Supreme Court determined that Bond does have standing to advance that challenge, and returned the *151 case to us to consider her constitutional argument.
In her merits argument, Bond urges us to set aside as inapplicable the landmark decision Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), which is sometimes cited for the proposition that the Tenth Amendment has no bearing on Congress’s ability to legislate in furtherance of the Treaty Power in Article II, § 2 of the Constitution. Cognizant of the widening scope of issues taken up in international agreements, as well as the renewed vigor with which principles of federalism have been employed by the Supreme Court in scrutinizing assertions of federal authority, we agree with Bond that treaty-implementing legislation ought not, by virtue of that status alone, stand immune from scrutiny under principles of federalism. However, because the Convention is an international agreement with a subject matter that lies at the core of the Treaty Power and because Holland instructs that “there can be no dispute about the validity of [a] statute” that implements a valid treaty, 252 U.S. at 432, 40 S.Ct. 382, we will affirm Bond’s conviction.
I. Factual Background and Procedural History
A. Facts
Bond’s criminal acts are detailed in our prior opinion, United States v. Bond, 581 F.3d 128, 131-33 (3d Cir.2009) (“Bondi”), and in the Supreme Court’s opinion, Bond v. United States, — U.S.-, 131 S.Ct. 2355, 2360-61, 180 L.Ed.2d 269 (2011) (“Bond II”), so we provide only a brief recitation here. Suffice it to say that, while Bond was employed by the chemical manufacturer Rohm and Haas, she learned that her friend Myrlinda Haynes was pregnant and that Bond’s own husband was the baby’s father. Bond became intent on revenge. To that end, she set about acquiring highly toxic chemicals, stealing 10-chlorophenoxarsine from her employer and purchasing potassium dich-romate over the Internet. She then applied those chemicals to Haynes’s mailbox, car door handles, and house doorknob. Bond’s poisonous activities were eventually discovered and she was indicted on two counts of acquiring, transferring, receiving, retaining, or possessing a chemical weapon, in violation of the Act. She was, in addition, charged with two counts of theft of mail matter, in violation of 18 U.S.C. § 1708.
B. Procedural History
Bond filed a motion to dismiss the counts that alleged violations of the Act. She argued that the Act was unconstitutional, both facially and as applied to her. More particularly, she said that the Act violated constitutional “fair notice” requirements, that it was inconsistent with the Convention it was meant to implement, and that it represented a breach of the Tenth Amendment’s protection of state sovereignty. Emphasizing that last point, Bond contended that neither the Commerce Clause, nor the Necessary and Proper Clause in connection with the Treaty Power, could support the expansive wording of the statute, let alone her prosecution. (See App. at 59 (arguing that, “[gjiven the localized ... scope of the conduct alleged, ... application of 18 U.S.C. § 229 signals a massive and unjustifiable expansion of federal law enforcement into state-regulated domain”).) The government’s response has shifted over time,[1] but *152 it has been consistent in maintaining that the Act is a constitutional exercise of Congress’s authority to enact treaty-implementing legislation under the Necessary and Proper Clause. The District Court accepted that argument and denied Bond’s motion to dismiss.
We affirmed on appeal, concluding that Bond lacked standing to pursue her Tenth Amendment challenge and that the Act was neither unconstitutionally vague nor unconstitutionally overbroad.[2] Bond I, 581 F.3d at 139. The Supreme Court granted certiorari to address the question of “[wjhether a criminal defendant convicted under a federal statute has standing to challenge her conviction on grounds that, as applied to her, the statute is beyond the federal government’s enumerated powers and inconsistent with the Tenth Amendment.” Petition for Writ of Certiorari, Bond v. United States (No. 09-1227), 2010 WL 1506717 at *i; see Bond v. United States, — U.S. -, 131 S.Ct. 455, 178 L.Ed.2d 285 (2010). Ultimately, the Court concluded that Bond “does have standing to challenge the federal statute.” Bond II, 131 S.Ct. at 2360. The case was remanded to us to address the “issue of the statute’s validity” which, as the Court instructed, “turns in part on whether the law can be deemed ‘necessary and proper for carrying into Execution’ the President’s Article II, § 2 Treaty Power.” Id. at 2367 (quoting U.S. Const. art. I, § 8, cl. 18).
II. Discussion[3]
In Missouri v. Holland, the Supreme Court declared that, if a treaty is valid, “there can be no dispute about the validity of the statute [implementing it] under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government.”[4] 252 U.S. at 432, 40 S.Ct. *153 382. Implicit in that statement is the premise that principles of federalism will ordinarily impose no limitation on Congress’s ability to write laws supporting treaties, because the only relevant question is whether the underlying treaty is valid. See id. at 432, 434, 40 S.Ct. 382 (stating that “it is not enough to refer to the Tenth Amendment, reserving the powers not delegated to the United States” because the Treaty Power is delegated, but acknowledging the possibility that there may sometimes be “invisible radiation[s] from the general terms of the Tenth Amendment”). Reasoning that a reading of Holland that categorically rejects federalism as a check on Congress’s treaty-implementing authority is of questionable constitutional validity, Bond asks us to invalidate her conviction because the Act is unconstitutional as applied to her.[5] She says that to hold otherwise would offend the Constitution’s balance of power between state and federal authority by “intruding] ... on the traditional state prerogative to punish assaults.” (Appellant’s Supp. Br. at 47.)
A. Constitutional Avoidance
Bond first argues, however, that we should avoid reaching the constitutional question by construing the Act not to apply to her conduct at all.[6]
Her avoidance argument begins with the text of the Act itself, which provides, in pertinent part, that “it shall be unlawful for any person knowingly ... to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon.” 18 U.S.C. § 229(a)(1). The term “chemical weapon” is defined broadly to include any “toxic chemical and its precursors,” id. § 229F(1)(A), and “[t]he term ‘toxic chemical’ means any chemical which through its chemical action on life processes can cause death, temporary incapacitation or perma *154 nent harm to humans or animals,” id. § 229F(8)(A). Congress did put some limit on the sweep of the Act by excluding from the definition of “chemical weapon” any chemicals and precursors “intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose.” Id. § 229F(1)(A). The phrase “purpose not prohibited under this chapter,” is then defined, in part, as “[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity.” Id. § 229F(7)(A). It is that “peaceful purpose” language that Bond urges us to take as our interpretive lodestar.
Specifically, Bond argues that, by looking to the “peaceful purpose” exception, we can employ a “common sense interpretation of § 229” that avoids “makfing] every malicious use of a household chemical”— including her own — a federal offense. (Appellant’s Supp. Br. at 17.) All we need do is “interpret the statute ... to reach [only the kind of acts] that would violate the Convention if undertaken by a signatory state.” (Id. at 14.) In other words, as Bond sees it, the modifier “peaceful” should be understood in contradistinction to “warlike” (3d Cir. Argument at 23), and, when so understood, the statute will not reach “conduct that no signatory state could possibly engage in — such as using chemicals in an effort to poison a romantic rival,” as Bond did. (Appellant’s Supp. Br. at 40.) That interpretation is tempting, in light of the challenges inherent in the Act’s remarkably broad language,[7] but, as we held the first time we had this case, Bond’s behavior “clearly constituted unlawful possession and use of a chemical weapon under § 229.” Bond I, 581 F.3d at 139.
That holding is in better keeping with the Act’s use of the term “peaceful purpose” than the construction Bond would have us give it. The ordinary meaning of “peaceful” is “untroubled by conflict, agitation, or commotion,” “of or relating to a state or time of peace,” or “devoid of violence or force,” Merriam-Webster’s Collegiate Dictionary 852 (10th ed. 2002), and Bond’s “deploy[ment of] highly toxic chemicals with the intent of harming Haynes,” Bond I, 581 F.3d at 139, can hardly be characterized as “peaceful” under that word’s commonly understood meaning, cf. Jones v. United States, 529 U.S. 848, 857-58, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (interpreting the federal arson statute not to reach “traditionally local criminal conduct” since the statute was “susceptible of two constructions” (citation and internal quotation marks omitted)). The term “peaceful,” moreover, does not appear in isolation: the Act only excludes from its ambit “peaceful purpose[s] ... related to *155 an industrial, agricultural, research, medical, or pharmaceutical activity or other activity.” 18 U.S.C. § 229F(7)(A) (emphasis added). Bond’s attacks on Haynes— even if non-warlike — were certainly not “related to an industrial, agricultural, research, medical, or pharmaceutical activity.” Id. Nor can her use of chemicals be said to be a “peaceful purpose[ ] ... related to an ... other activity,” because regarding her assaultive behavior as such would improperly expand § 229F(7)(A)’s scope. See, e.g., Gooch v. United States, 297 U.S. 124, 129, 56 S.Ct. 395, 80 L.Ed. 522 (1936) (“The rule of ejusdem generis ... [ojrdinarily ... limits general terms which follow specific ones to matters similar to those specified.”).
Thus, while one may well question whether Congress envisioned the Act being applied in a case like this, the language itself does cover Bond’s criminal conduct. And, given the clarity of the statute, we cannot avoid the constitutional question presented. See United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 1591, 176 L.Ed.2d 435 (2010) (stating that only “ ‘ambiguous statutory language [should] be construed to avoid serious constitutional doubts’ ” (alteration in original) (citation omitted)); United States v. Locke, 471 U.S. 84, 96, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (“We cannot press statutory construction ‘to the point of disingenuous evasion’ even to avoid a constitutional question.” (quoting George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933))). It is not our prerogative to rewrite a statute, and we see no sound basis on which we can accept Bond’s construction of the Act without usurping Congress’s legislative role. Though we agree it would be better, if possible, to apply a limiting construction to the Act rather than consider Bond’s argument that it is unconstitutional, see Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) (“It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case”), the statute speaks with sufficient certainty that we feel compelled to consider the hard question presented in this appeal.
B. Constitutionality of the Act as Applied
Understanding whether application of the Act to Bond violates the structural limits of federalism begins with the Tenth Amendment, which Bond cites and which provides that “[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” U.S. Const, amend. X. That text, as the Supreme Court has observed, “confirms that the power of the Federal Government is subject to limits that may ... reserve power to the States.” New York v. United States, 505 U.S. 144, 157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, it encapsulates the principles of federalism upon which our nation was founded. See D.A. Jeremy Telman, A Truism That Isn’t True? The Tenth Amendment and Executive War Power, 51 Cath. U.L.Rev. 135, 143-44 (2001) (describing the argument that “the Tenth Amendment has a declaratory function and provides a rule of constitutional interpretation rather than a rule of constitutional law”).[8]
*156 Endeavoring to discover what impact the Tenth Amendment may have on treaty-implementing legislation immediately leads, as we have indicated, to the Supreme Court’s decision in Missouri v. Holland. The statute at issue in that case, the Migratory Bird Treaty Act, 16 U.S.C. § 703, implemented a treaty between the United States and Great Britain that banned the hunting of migratory birds during certain seasons. Holland, 252 U.S. at 431, 40 S.Ct. 382. The State of Missouri brought suit against a U.S. game warden, arguing that the statute unconstitutionally interfered with the rights reserved to Missouri by the Tenth Amendment because Missouri was free to do what it wished with the birds while they were within its borders. Id. at 431-32, 40 S.Ct. 382. The Supreme Court, speaking through Justice Holmes, rejected that argument, reasoning that “it is not enough to refer to the Tenth Amendment, reserving the powers not delegated to the United States, because by Article 2, Section 2, the power to make treaties is delegated expressly.” Id at 432, 40 S.Ct. 382.
As noted earlier, the Court made it clear that Congress may, under the Necessary and Proper Clause, legislate to implement a valid treaty, regardless of whether Congress would otherwise have the power to act or whether the legislation causes an intrusion into what would otherwise be within the state’s traditional province. Id. at 432-33, 40 S.Ct. 382. While the Court did allow that there may be “qualifications to the treaty-making power,” it also said, somewhat obscurely, that they had to be found “in a different way” than one might find limitations on other grants of power to the federal government. Id. at 433, 40 S.Ct. 382. After implying that Congress’s powers are particularly sweeping when dealing with “matters requiring national action,” the Court suggested one limitation on the Treaty Power: if the implementation of a treaty “eontravene[s] any prohibitory words to be found in the Constitution,” then it may be unconstitutional. Id. (citation omitted). Since the treaty in question did not do that, the only remaining question was “whether it [was] forbidden by some invisible radiation from the general terms of the Tenth Amendment.” Id. at 433-34, 40 S.Ct. 382. The Court concluded that it was not. See id. (reasoning that, while “the great body of private relations usually fall within the control of the State, ... a treaty may override its power”). Finally, the Court assumed with *157 out further discussion that, because the treaty was valid, so was the implementing statute. See id. at 435, 40 S.Ct. 382 (“We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed.”).
In sum, Holland teaches that, when there is a valid treaty, Congress has authority to enact implementing legislation under the Necessary and Proper Clause, even if it might otherwise lack the ability to legislate in the domain in question.[9] See United States v. Lara, 541 U.S. 193, 201, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (“[A]s Justice Holmes pointed out [in Holland], treaties made pursuant to [the Treaty Power] can authorize Congress to deal with ‘matters’ with which otherwise ‘Congress could not deal.’ ” (quoting Holland, 252 U.S. at 433, 40 S.Ct. 382)). The legislation must, of course, meet the Necessary and Proper Clause’s general requirement that legislation implemented under that Clause be “rationally related to the implementation of a constitutionally enumerated power.” United States v. Comstock, — U.S.-, 130 S.Ct. 1949, 1956, 176 L.Ed.2d 878 (2010); see also McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819) (“[A]ll means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.”). In the treaty context, that requirement has been understood to mean that a treaty and its implementing legislation must be rationally related to one another. United States v. Ferreira, 275 F.3d 1020, 1027 (11th Cir.2001). Thus, as long as “the effectuating legislation bear[s] a rational relationship to” a valid treaty, United States v. Lue, 134 F.3d 79, 84 (2d Cir.1998), the arguable consequence of Holland is that treaties and associated legislation are simply not subject to Tenth Amendment scrutiny, no matter how far into the realm of states’ rights the President and Congress may choose to venture. See Curtis A. Bradley, The Treaty Power and American Federalism, 97 Mich. L.Rev. 390, 395 (1998) (taking exception with Holland to the extent it can be read to say that “the treaty power is immune from federalism restrictions because that power has been exclusively delegated to the federal government”); Erwin Cheme-rinsky, Constitutional Law: Principles and Policies 287 (4th ed. 2011) (stating that the Holland court “rejected the claim that state sovereignty and the Tenth Amendment limit the scope of the treaty power”); Louis Henkin, Foreign Affairs and the U.S. Constitution 191 (2nd ed. *158 1996) (“What [Holland ] said, simply, was that the Constitution delegated powers to various branches of the federal government, not only to Congress; the Treaty Power was delegated to the federal treaty-makers, a delegation additional to and independent of the delegations to Congress. Since the Treaty Power was delegated to the federal government, whatever is within its scope is not reserved to the states: the Tenth Amendment is not material.” (internal footnote omitted)). But see David M. Golove, Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power, 98 Mich. L.Rev. 1075, 1085 (2000) (noting that “treaties are not immune from federalism limitations, and nothing in [Holland ] suggests the contrary,” but acknowledging that “it is difficult to imagine realistic scenarios in which treaty stipulations would violate [the applicable] limitations”).
Bond vigorously disputes the implications of that conclusion. Specifically, she argues that legal trends since the Supreme Court’s 1920 decision in Holland make it clear that the Tenth Amendment should not be treated as irrelevant when examining the validity of treaty-implementing legislation. (See Appellant’s Supp. Br. at 24 (“[I]n recent decades, the Supreme Court has reasserted the critical role of the Tenth Amendment in preserving the proper balance of authority between federal and state government to ensure that all levels of government represent and remain accountable to the People.”).) Concluding otherwise, she asserts, would make “nothing ... off-limits” in a world where, more and more, “international treaties govern[ ] a virtually unlimited range of subjects and intrud[e] deeply on internal concerns.” (See id. at 20.) That latter point is not without merit. Juxtaposed against increasingly broad conceptions of the Treaty Power’s scope, reading Holland to confer on Congress an unfettered ability to effectuate what would now be considered by some to be valid exercises of the Treaty Power runs a significant risk of disrupting the delicate balance between state and federal authority.[10] '
*159 Those concerns notwithstanding, Bond does not argue that the Convention itself is constitutionally infirm. On the contrary, she admits “that a treaty restricting chemical weapons is a ‘proper subjectf ] of negotiations between our government and other nations.’ ” (Id. at 4-5 (alteration in original) (citation omitted)). Accordingly, we need not tackle, head on, whether an arguably invalid treaty has led to legislation encroaching on matters traditionally left to the police powers of the states. Nevertheless, resolving the argument Bond does lodge against her prosecution requires at least some consideration of whether the Convention is, in fact, valid. See Holland, 252 U.S. at 432, 40 S.Ct. 382 (“If the treaty is valid there can be no dispute about the validity of the statute .... ” (emphasis added)). We therefore turn briefly to whether the Convention falls within the Treaty Power’s appropriate scope, bearing in mind that Bond seems to accept that it does.
1. The Convention’s Validity
The Constitution does not have within it any explicit subject matter limitation on the power granted in Article II, § 2. That section states simply that the President has the “Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur.” U.S. Const. art. II, § 2, cl. 2. Throughout much of American history, however, including when Holland was handed down, it was understood that the Treaty Power was impliedly limited to certain subject matters. See Bradley, supra, at 429 (arguing that “a subject matter limitation [on the Treaty Power] appears to have been assumed both during the Founding and at times during the nineteenth century,” and suggesting it was likewise assumed by the Holland court); Golove, supra, at 1288 (“[V]irtually every authority, including the Supreme Court, has on countless occasions from the earliest days recognized general subject matter limitations on treaties.”).
Contemporaneous records such as the Virginia Ratifying Convention show that the Founders generally accepted that the purpose of treaties was, as James Madison put it, to regulate “intercourse with foreign nations,” and that the “exercise” of the Treaty Power was expected to be “consistent with” those “external” ends.[11] 3 *160 The Debates in The Several State Conventions on the Adoption of the Constitution 514-15 (Jonathan Elliot ed., 2d ed. 1941) (“The Virginia Debates ”); see The Federalist No. 45 (James Madison) (stating that the Treaty Power "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce”). As Madison later explained, if there was
no limitation on the Treaty-making power ..., it might admit of a doubt whether the United States might not be enabled to do those things by Treaty which are forbidden to be done by Congress ...; but no such consequence can follow, for it is a sound rule of construction, that what is forbidden to be done by all the branches of Government conjointly, cannot be done by one or more of them separately.
5 Annals of Congress 671 (1796) (emphasis added).
Early cases followed that reasoning and indicated that the Treaty Power is confined to matters traditionally understood to be of international concern. See, e.g., Ross v. McIntyre, 140 U.S. 453, 463, 11 S.Ct. 897, 35 L.Ed. 581 (1891) (“The treaty-making power vested in our government extends to all proper subjects of negotiation with foreign governments.”); De Geo-froy v. Riggs, 133 U.S. 258, 266, 10 S.Ct. 295, 33 L.Ed. 642 (1890) (“That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations is clear.”); Holden v. Joy, 84 U.S. (17 Wall.) 211, 243, 21 L.Ed. 523 (1872) (“[I]nasmueh as the power is given, in general terms, without any description of the objects intended to be embraced within its scope, it must be assumed that the framers of the Constitution intended that it should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects of negotiation and treaty....”).
That is not to say, however, that any treaty encroaching on matters ordinarily left to the states was considered to be beyond the Treaty Power’s permissible ambit. On the contrary, so long as the subject matter limitation was satisfied— which it undoubtedly was in cases involving “subjects [such as] peace, alliance, commerce, neutrality, and others of a similar nature,” William Rawle, A View of the Constitution of the United States 65 (2d ed. 1829), or, as Jay put it, “war, peace, and commerce,” The Federalist No. 64 (John Jay) — it was accepted that treaties could affect domestic issues. Many early decisions of the Supreme Court upheld treaties of that nature, including treaties regarding the ownership and transfer of property. See, e.g., Carneal v. Banks, 23 U.S. (10 Wheat.) 181, 189, 6 L.Ed. 297 (1825) (treaty between the United States and France that allowed citizens of either country to hold lands in the other). Still, it was widely accepted that the Treaty Power was inherently limited in the subject matter it could properly be used to address, see Santovincenzo v. Egan, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151 (1931) (“The treatymaking power is broad enough to cover all subjects that properly pertain to our foreign relations.... ”); Asakura v. City of Seattle, 265 U.S. 332, 341, 44 S.Ct. 515, 68 L.Ed. 1041 (1924) (“The treaty-making power of the United States ... does not extend ‘so far as to authorize what the Constitution 'forbids,’ ... [but] does extend to all proper sub *161 jects of negotiation between our government and other nations.”), and that the purpose of limiting the Treaty Power to matters which “in the ordinary intercourse of nations had usually been made subjects of negotiation and treaty” was to ensure that treaties were “consistent with ... the distribution of powers between the general and state governments,” Holmes v. Jenni-son, 39 U.S. (14 Pet.) 540, 569, 10 L.Ed. 579 (1840).
Despite the long history of that view of the Treaty Power, the tide of opinion, at least in some quarters, has shifted decisively in the last half-century. Many influential voices now urge that there is no limitation on the Treaty Power, at least not in the way understood from the founding through to the middle of the Twentieth Century.[12] See Bradley, supra, at 433 (describing the “rejection of a subject matter limitation on the treaty power” as “the accepted view”). That change is reflected in the Restatement (Third) of Foreign Relations Law of the United States (1987) (the “Third Restatement”), which declares flatly that, “[cjontrary to what was once suggested, the Constitution does not require that an international agreement deal only with ‘matters of international concern.’ ”[13] Third Restatement § 302 cmt. c; see id. § 303(1) (“[T]he President, with the advice and consent of the Senate, may make any international agreement of the United States in the form of a treaty.”).
Whatever the Treaty Power’s proper bounds may be, however, we are confident that the Convention we are dealing with here falls comfortably within them. The Convention, after all, regulates the proliferation and use of chemical weapons. One *162 need not be a student of modern warfare to have some appreciation for the devastation chemical weapons can cause and the corresponding impetus for international collaboration to take steps against their use. Given its quintessentially international character, we conclude that the Convention is valid under any reasonable conception of the Treaty Power’s scope. In fact, as we discuss at greater length herein, because the Convention relates to war, peace, and perhaps commerce,[14] it fits at the core of the Treaty Power. See infra note 18.
2. Interpreting Holland
Because Holland clearly instructs that “there can be no dispute about the validity of [a] statute” that implements a valid treaty, 252 U.S. at 432, 40 S.Ct. 382, the constitutionality of Bond’s prosecution would seem to turn on whether the Act goes beyond what is necessary and proper to carry the Convention into effect, or, in other words, whether the Act fails to “bear a rational relationship to” the Convention, Lue, 134 F.3d at 84. According to Bond, however, only a simplistic reading of Holland could lead one to think that the Supreme Court was saying that “Congress’s power to implement treaties is subject to no limit other than affirmative restrictions on government power like the First Amendment.” (Appellant’s Supp. Reply Br. at 9-10.)
The problem with Bond’s attack is that, with practically no qualifying language in Holland to turn to, we are bound to take at face value the Supreme Court’s statement that “[i]f the treaty is valid there can be no dispute about the validity of the statute ... as a necessary and proper means to execute the powers of the Government.” 252 U.S. at 432, 40 S.Ct. 382. A plurality of the Supreme Court itself apparently gave that passage the simplistic reading Bond denounces when it said, in Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), that:
The Court [in Holland] was concerned with the Tenth Amendment which reserves to the States or the people all power not delegated to the National Government. To the extent that the United States can validly make treaties, the people and the States have delegated their power to the National Government and the Tenth Amendment is no barrier.
Id. at 18, 77 S.Ct. 1222.
It is true that Justice Holmes spoke later in Holland in language that implies a balancing of the national interest against the interest claimed by the State, see Holland, 252 U.S. at 435, 40 S.Ct. 382 (“Here a national interest of very nearly the first magnitude is involved.”), but that was in the context of assessing the validity of the Migratory Bird Treaty itself, not the implementing statute. That the latter was constitutional in light of the validity of the former seemed to the Supreme Court to require no further comment at all.[15]
*163 That does not mean, of course, that the Holland court would have spoken in the same unqualified terms had it foreseen the late Twentieth Century’s changing claims about the limits of the Treaty Power, or had it been faced with a treaty that transgressed the traditional subject matter limitation.[16] See id. at 433, 40 S.Ct. 382 (“The case before us must be considered in light of our whole experience and not merely in that of what was said a hundred years ago.”). It may well have chosen to say more about how to assess the validity of a treaty, and hence of coextensive treaty-implementing legislation. Perhaps Holland ’s vague comment about “invisible radiation[s] from the general terms of the Tenth Amendment,” id. at 434, 40 S.Ct. 382, would have been given some further explication. As we have previously described, when Holland was decided, and, more importantly, when the Founders created the Treaty Power, it was generally understood that treaties should concern only matters that were clearly “international” in character, matters which, in Holland’s words, invoke a national interest that “can be protected only by national action in concert with that of another [sovereign nation].” Id. at 435, 40 S.Ct. 382. All the authors of The Federalist Papers, along with others from that era, considered the Treaty Power to be a necessary attribute of the central government for the important but limited purpose of permitting our “intercourse with foreign nations,” The Virginia Debates, supra, at 514 (statement of James Madison), and thereby allowing for compacts “especially as [they] relate[] to war, peace, and commerce,” The Federalist No. 64 (John Jay); see supra Part II.B.l. It was not a general and unlimited grant of power to the federal government.[17]
Because an implied subject matter limitation on the Treaty Power was a given at the time Holland was written, it was enough to answer the states’ rights question'in that case by pointing out that the Tenth Amendment only reserves those powers that are not delegated and that “the power to make treaties is delegated expressly.” 252 U.S. at 432, 40 S.Ct. 382. Thus, Holland’s statement that “there can be no dispute about the validity” of a statute implementing a valid treaty, id., is *164 sensible in context and, in any event, binds us. We do not discount the significance of the Supreme Court’s emphasis on the important role that federalism plays in preserving individual rights, Bond II, 131 S.Ct. at 2364, and it may be that there is more to say about the uncompromising language used in Holland than we are able to say,[18] but that very direct language *165 demands from us a direct acknowledgement of its meaning, even if the result may be viewed as simplistic. If there is nuance there that has escaped us, it is for the Supreme Court to elucidate.
3. The Necessary and Proper Clause
Thus, because the Convention falls comfortably within the Treaty Power’s traditional subject matter limitation, the Act is within the constitutional powers of the federal government under the Necessary and Proper Clause and the Treaty Power, unless it somehow goes beyond the Convention. Bond argues that it does.[19]
She says that the Act covers a range of activity not actually banned by the Convention and thus cannot be sustained by the Necessary and Proper Clause. Whether that argument amounts to a facial or an as-applied attack on the Act, see supra note 5, it fails. We stated in Bond I that “Section 229 ... closely adheres to the language of the ... Convention,” 581 F.3d at 138, and so it does. True, as Bond notes, the Convention bans persons from using, developing, acquiring, stockpiling, or retaining chemical weapons, 32 I.L.M. at 804, while the Act makes it unlawful to “receive, stockpile, retain, own, possess, use, or threaten to use” a chemical weapon, 18 U.S.C. § 229(a)(1), but those differences in wording do not prove that the Act has materially expanded on the Convention. See United States v. Belfast, 611 F.3d 783, 806 (11th Cir.2010) (“[T]he existence of slight variances between a treaty and its congressional implementing legislation do not make the enactment unconstitutional; identically is not required.”). The meaning of the list in the former seems rather to fairly encompass the latter (with the possible exception of the “threaten to use” provision of the Act) and, if the Act goes beyond the Convention at all, does not do so in the “use” aspect at issue here.
So while Bond’s prosecution seems a questionable exercise of prosecutorial discretion,[20] and indeed appears to justify her assertion that this case “trivializes the concept of chemical weapons” (Appellant’s Supp. Br. at 53), the treaty that gave rise to it was implemented by sufficiently related legislation. See Comstock, 130 S.Ct. at 1956 (“[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.”); Lue, 134 F.3d at 84 (rejecting the argument “that because the Hostage Taking Convention targets a specific aspect of international terrorism — hostage taking— the statute effectuating the Convention must deal narrowly with international terrorism or risk invalidity” as a “cramped” *166 view of Congressional authority, because treaty-implementing legislation must simply “bear a rational relationship to a permissible constitutional end”).
In short, because the Convention pertains to the proliferation and use of chemical weapons, which are matters plainly relating to war and peace, we think it clear that the Convention falls within the Treaty Power’s core. See supra note 18. Consequently, we cannot say that the Act disrupts the balance of power between the federal government and the states, regardless of how it has been applied here. See Gonzales v. Raich, 545 U.S. 1, 23, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (“[W]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.” (citations and internal quotation marks omitted));[21] Holland, 252 U.S. at 432, 40 S.Ct. 382 (“If the treaty is valid there can be no dispute about the validity of the [implementing] statute.... ”); cf. U.S. Const. art. VI, cl. 2 (“[A]ll Treaties made ... shall be the supreme Law of the Land.”).
III. Conclusion
For the foregoing reasons, we will affirm the judgment of conviction.

. The government has, at different stages of this case, been willing to jettison one legal position and adopt a different one, as seemed convenient. Before the District Court, it expressly disclaimed the Commerce Clause as a basis for Congress's power to approve the Act. *152 (See E.D. Pa. No. 07-cr-528, doc. no. 30, at 7 (“Title 18, United States Code, Section 229 was not enacted under the interstate commerce authority but under Congress’s authority to implement treaties.”).) The government still maintained that position the first time it appeared before us, relying only on the Necessary and Proper Clause in support of the Act's constitutionality. (See Appellee's Initial Br. at 20-32.) Once before the Supreme Court, however, the government decided that this is really a Commerce Clause case and that the position it had pressed before us is secondary. That change was in addition to abandoning the position on standing that it had previously taken. See infra note 2.

.We determined that Bond lacked standing to pursue her Tenth Amendment challenge after requesting supplemental briefing on the question of whether she "ha[d] standing to assert that 18 U.S.C. § 229 encroaches on state sovereignty in violation of the Tenth Amendment to the United States Constitution absent the involvement of a state or its instru-mentalities[J” (United States v. Bond, No. 08-2677, 08/14/2009 Letter to Counsel.) The government responded that Bond lacked such standing under Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), which held that "appellants, absent the states or their officers, have no standing ... to raise any question under the [Tenth] [A]mendment,” id. at 144, 59 S.Ct. 366. (United States v. Bond, No. 08-2677, 08/20/2009 Letter from Appel-lee.) Before the Supreme Court, however, the government reversed course and argued that Bond did have standing to make a Tenth Amendment challenge. See Bond II, 131 S.Ct. at 2361 (describing the government's initial "position that Bond did not have standing” and the changed position before the Supreme Court that "Bond does have standing”).

. The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and review de novo a challenge to the constitutionality of a criminal statute, Bond I, 581 F.3d at 133.

. The referenced section of the Constitution is the Necessary and Proper Clause, which provides Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitu *153 tion in the Government of the United States, or in any Department or Officer thereof.” U.S. Const, art. I, § 8, cl. 18.

. It appears that Bond has abandoned her facial challenge to the Act. Her argument, both in her supplemental briefing before us and at oral argument, is articulated as an as-applied challenge. (See, e.g., Appellant's Supp. Br. at 26 ("Bond is raising a ... limited and narrowly focused as-applied challenge. She contends that, whatever its validity more generally, the statute cannot be constitutionally applied to her in the circumstances of this case.”); Transcript of Oral Argument at 11-13, United States v. Bond, No. 08-2677 ("3d Cir. Argument”).) And, Bond’s counsel commented at oral argument that he was "trying ... [to be] respectful of the Supreme Court's jurisprudence that says you don’t lightly bring a facial challenge” to a statute. (3d Cir. Argument at 62.) Counsel framed his argument as being that "the prin-cipien that [the statute has] offended is that if you apply it so broadly that it criminalizes every malicious use of poisoning, then you’ve overridden the structural limitations on the government and the division of power between the federal government and the states.” (Id. at 15-16.) We thus take it as granted that, although some of her past arguments move into the territory of a facial challenge, Bond is not now saying that Congress was without power to pass the Act but is, instead, arguing that Congress could not properly pass it if the Act’s language is interpreted in a way that reaches her conduct. In short, we are dealing with an as-applied, rather than a facial, challenge.

. Bond's constitutional avoidance argument necessarily presumes a serious constitutional problem, notwithstanding Holland. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (stating the constitutional avoidance inquiry should be undertaken in the face of "serious constitutional problems”). Regardless of Holland’s breadth, we accept Bond’s suggestion that it is prudent to begin our analysis with the avoidance doctrine.

. The Act's breadth is certainly striking, seeing as it turns each kitchen cupboard and cleaning cabinet in America into a potential chemical weapons cache. Cf. Transcript of Oral Argument at 29, Bond v. United States, — U.S. -, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011) (Justice Alito's statement during oral argument that "pouring a bottle of vinegar in [a] friend’s goldfish bowl” could constitute the use of a chemical weapon under the Act and expose a person to years in federal prison). We observed as much the last time this case was before us, noting, as Bond had herself acknowledged at the time, that the Act's wide net was cast "for obvious reasons.” Bond I, 581 F.3d at 139. Ultimately, however, we concluded that the Act was not unconstitutionally overbroad. See id. (observing that the Act is "certainly broad," but not unconstitutionally so). Bond did not challenge that determination, see Petition for Writ of Certiorari, Bond v. United States (No. 09-1227), 2010 WL 1506717 at *i, and it remains undisturbed. That the Act is not unconstitutionally overbroad, of course, does not preclude Bond from arguing, as she now does, that the Act offends the Constitution's division of power between the federal government and the states to the extent it is used to make her conduct a federal crime.

. We do not need to determine whether the Tenth Amendment is a tautology reflecting the structural limitations on federal power embodied in the system of dual sovereignty established by the Constitution, or, as has sometimes been suggested, serves as an independent check on federal power. See New York, 505 U.S. at 156, 160, 112 S.Ct. 2408 (describing the argument that, even when Congress has the authority to regulate, “the *156 Tenth Amendment limits the power of Congress to regulate in the way it has chosen,” though noting that its actual limit “is not derived from the text” of the Tenth Amendment as the Tenth Amendment is "essentially a tautology”); Nat'l League of Cities v. Usery, 426 U.S. 833, 842, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (recognizing a "limit[] upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers ... which are conferred by Art. I of the Constitution” and that "an express declaration of this limitation is found in the Tenth Amendment”), overruled by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); cf. Gerard N. Magliocca, A New Approach to Congressional Power: Revisiting the Legal Tender Cases, 95 Geo. L.J. 119, 125 n. 30 (2006) (suggesting the Tenth Amendment’s "independent force” is limited to "[l]aws that regulate states qua states”). Regardless of whether the Tenth Amendment has "independent force of its own,” Bond II, 131 S.Ct. at 2367, we understand our constitutional inquiry to turn on whether principles of federalism are violated by the Act, in light of the Constitution’s delegation to the President of the power "to make Treaties, provided two thirds of the Senators present concur,” U.S. Const. art. II, § 2, cl. 2, and to Congress of the power to enact "all Laws which shall be necessary and proper for carrying into Execution ... all other Powers vested by th[e] Constitution in the Government of the United States, or in any Department or Officer thereof,” U.S. Const. art. I, § 8, cl. 18.

. It has been argued that Holland incorrectly permits "treaties ... [to] expand the legislative power of -Congress.” Nicholas Quinn Rosenkranz, Executing The Treaty Power, 118 Harv. L.Rev. 1867, 1875 (2005). The Cato Institute has submitted an amicus brief taking that position, arguing against Holland’s "implication] that if a treaty commits the United States to enact some legislation, then Congress automatically obtains the power to enact that legislation, even if it would lack such power in the absence of the treaty.” (Amicus Br. at 6.) Amicus argues that Congress’s authority to act in connection with the Treaty Power only permits it to enact those laws that are necessary and proper to permit the President to make treaties — not to implement treaties once they are agreed upon. (See id. (arguing the President cannot increase Congress’s power under the Necessary and Proper Clause by entering into a treaty).) Under that view, Congress could, for example, legislate to provide funding for an office of treaty-making, but could not have implemented the broadly worded Convention involved here. (See id. at 8 ("[T]his power would ... embrace any ... laws necessary and proper to ensuring the wise use of the power to enter treaties.”).) Holland remains binding precedent, however, and forecloses this line of reasoning.

. The Supreme Court has focused renewed attention on federalism over the last two decades. Although many earlier cases reflect the importance of the our Constitution’s basic provision for dual sovereigns, see, e.g., Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (observing that the rule requiring Congress to speak clearly in order to preempt state law "acknowledges] that the States retain substantial sovereign powers under our constitutional scheme”); South Dakota v. Dole, 483 U.S. 203, 211-12, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (recognizing that Congress may not coerce the states when exercising its power to spend), more recent cases have been particularly pointed in describing the role federalism principles should play in analyzing assertions of federal authority. That trend began at least as early as the Court's decision in New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), which held that the federal government could not “commandeer[] the legislative processes of the States.” Id. at 176, 112 S.Ct. 2408 (citation and internal quotation marks omitted). After New York, the Court struck down legislation criminalizing local conduct in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), as beyond the Commerce Clause Power. In doing so the Court recognized the importance of the states' authority to “defin[e] and enforc[e] the criminal law,” and noted that, "[w]hen Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction.” Id. at 561 n. 3, 115 S.Ct. 1624 (citations and internal quotation marks omitted). In Printz v. United States, 521 U.S. 898, 919, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the Court likewise considered principles of federalism in striking down legislation that required state police to perform background checks on potential gun owners. See id. at 919, 117 S.Ct. 2365 (noting the establishment of dual sovereignties was "reflected throughout the Constitution's text,” and had vested in the states " 'a residuary and inviola *159 ble sovereignty.’ ” (quoting The Federalist No. 39 (James Madison))). Similarly, in United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Court struck down legislation making it a federal offense to commit a crime of violence motivated by gender, observing that "[t]he Constitution requires a distinction between what is truly national and what is truly local,” id. at 617-18, 120 S.Ct. 1740, and that there was "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims,” id. at 618, 120 S.Ct. 1740.

. Other Founders shared Madison's understanding that the Treaty Power would be limited to matters involving foreign affairs. Cf. The Federalist No. 64 (John Jay) (noting that the "power of making treaties is an important one, especially as it relates to war, peace, and commerce”); The Federalist No. 75 (Alexander Hamilton) (stating that treaties "[were] not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign"). Notwithstanding the Founders’ view of the Treaty Power’s inherent limits, there is, again, nothing in the Constitution’s text explicitly confining that power. The basis for that omission is perhaps best explained by Madison, who, like others, recognized the need for flexibility with respect to the Treaty Power and cautioned against expressly defining its scope:
I do not think it possible to enumerate all the cases in which such external regulations would be necessary. Would it be right to define all the cases in which Congress could exercise this authority[?] The definition might, and probably would, be defective. *160 They might be restrained, by such a definition, from exercising the authority where it would be essential to the interest and safety of the community. It is most safe, therefore, to leave it to be exercised as contingencies may arise.
The Virginia Debates, supra, at 514-15.

. Although at least one commentator has disputed that shift, see Golove, supra, at 1281, 1289 (stating that "commentators ... have not rejected subject matter limitations” to the treaty power and arguing that, "[wjere the President and Senate to make a treaty on a subject inappropriate for negotiation and agreement, and thus beyond the scope of the treaty power, the treaty would be invalid under the Tenth Amendment”), even then it has been acknowledged that "the traditional subject matter limitations on treaties are very general, and with globalization, the matters appropriate for treaties have expanded and will continue to do so,” id. at 1291. That reality has been borne out by the kinds of conventions now extant in the international community. See Bradley, supra, at 397 n. 29 (citing to, inter alia, the Convention on the Rights of the Child, open for signature Nov. 20, 1989, 28 I.L.M. 1456 (1989); the Convention on the Elimination of All Forms of Discrimination Against Women, S. Exec. Rep. No. 103-38 (1994); and the International Covenant on Economic, Social, and Cultural Rights, open for signature Dec. 19, 1966, 6 I.L.M. 360 (1967)). Considering the expanding subjects taken up in treaty-making and the nebulous standards associated with any lingering subject matter limitation, see Go-love, supra, at 1090 ("The implication is clear; the President and Senate can make treaties on any subject appropriate for negotiation and agreement among states.” (emphasis added)); Laurence H. Tribe, Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L.Rev. 1221, 1261 n. 133 (1995) ("The Treaty Power is legitimate only for international agreements fairly related to foreign relations” (emphasis added)), whether the subject matter limitation has fully eroded is a serious question. For now, however, it is enough to note that, at least among certain commentators, it is no longer viewed as a meaningful restraint on the Treaty Power. Cf. Henkin, supra, at 197 & n. 89 (citing the Third Restatement for the proposition that a limitation on the Treaty Power to matters of international concern "has now been authoritatively abandoned”).

. It, evidently, is not alone in that view. See, e.g., Tribe, supra, at 1261 n. 133 ("[Ejstablishment of a joint, binational health care system by a treaty followed by implementing legislation would presumably be possible....”); Henkin, supra, at 474 ("[W]hat is essentially a matter of ‘domestic concern' becomes a matter of 'international concern' if nations do, in fact, decide to bargain about it.”).

. Because we conclude that the Act is valid under the Necessary and Proper Clause, we express no opinion as to the merits of the Government's newly-discovered Commerce Clause argument.

. Bond recognizes that the Holland court "treated the legislation and treaty as co-extensive.” (Appellant’s Supp. Br. at 23.) Her conclusion from that is that when a treaty and its implementing legislation are not coextensive, the justification for enacting the legislation under the Necessary and Proper clause can collapse. We do not disagree; as noted, a treaty and treaty-implementing legislation must be "rationally related." Ferreira, 275 F.3d at 1027. As we discuss at greater length infra, however, the Act and the Convention with which we are dealing here are coextensive at least on the question of "use,” which is the only point relevant to Bond's as-applied challenge. See infra Part II.B.3.

. The treaty at issue in Holland involved a subject of traditional international concern. See 56 Cong. Rec. 7361 (1918) (legislative testimony that the Migratory Bird Treaty Act "is essential to the preservation of our cotton, grain, and timber crops, whilst the migratory game birds contribute materially to our food supply. The bill may well be considered a measure of importance as affecting the successful prosecution of the war in which we are now engaged"). As the Holland court noted, "nothing in the Constitution ... compelled] the Government to sit by while a food supply [was] cut off and the protectors of our forests and our crops [were] destroyed.” 252 U.S. at 435, 40 S.Ct. 382. Consequently, the treaty dealt with "a national interest of very nearly the first magnitude” that could "only [be furthered] by national action in concert with that of another power.” Id. at 435, 40 S.Ct. 382; see id. at 433, 40 S.Ct. 382 (stating that the treaty dealt with a "matter[] of the sharpest exigency” and that "the States individually [were] incompetent to act”).

. That the Founders understood Article II, § 2 to be a limited grant of power is clear, as the Tenth Amendment itself verifies. The available evidence of their thinking is that they did not intend for treaties to become a vehicle to usurp the general powers reserved to the states. Cf. United States v. Pink, 315 U.S. 203, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942) ("It is of course true that even treaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy.”); Holmes, 39 U.S. at 569, 39 U.S. 540 ("The power to make treaties ... was designed to [be] ... consistent with ... the distribution of powers between the general and state governments.”).

. We pause to consider how, if Holland were not so clear in its "valid treaty equal valid implementing legislation” holding, treaties and implementing legislation might usefully be reviewed in light of the apparently evolving understanding of the Treaty Power that we have described. See supra Part II.B.l. The Founders deliberately drafted Article II, § 2 without defining the limits of the Treaty Power because they decided its scope required flexibility in the face of unknowable future events. Cf. The Virginia Debates, supra, at 514-15 (James Madison's observation that "it [is not] possible to enumerate all the cases in which such external regulations would be necessary.... It is most safe, therefore, to leave it to be exercised as contingencies may arise”). We do not second guess the wisdom of their choice and acknowledge that any attempt to precisely define a subject matter limitation on the Treaty Power would involve political judgments beyond our ken. Cf. Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (stating that resolution of issues "touching foreign relations” often "turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to” a coordinate branch); Pink, 315 U.S. at 232, 62 S.Ct. 552 ("[T]he field which affects international relations is 'the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority’....” (citation omitted)); Lue, 134 F.3d at 83 ("[I]t is not the province of the judiciary to impinge upon the Executive's prerogative in matters pertaining to foreign affairs.”).
Nevertheless, while the outer boundaries of the Treaty Power may be hard to delineate, we can safely say that certain kinds of treaties fall within the core of that power, namely those dealing with war, peace, foreign commerce, and diplomacy directed to those ends. See The Federalist No. 45 (James Madison) (stating that the Treaty Power "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce”); The Federalist No. 64 (John Jay) (stating the "power of making treaties is an important one, especially as it relates to war, peace, and commerce”). As to treaties of such character, it is hard to argue with the reasoning in Holland that, because "the power to make treaties is delegated expressly,” 252 U.S. at 432, 40 S.Ct. 382, the Tenth Amendment has nothing meaningful to say. However, just as some treaties may fall comfortably within the traditionally understood bounds of the Treaty Power, some may be negotiated that will plainly fall outside that scope. If such a treaty were challenged, a court would be bound to take up an issue not present here, namely whether and when a treaty has reached a constitutional boundary, see Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.”); cf. Baker, 369 U.S. at 211, 82 S.Ct. 691 (observing that not "every case or controversy which touches foreign relations lies beyond judicial cognizance”), recognizing that a treaty falling outside the limits of the Treaty Power would be unconstitutional as ultra vires, cf. Joseph Story, Commentaries on the Constitution of the United States 339 (Melville M. Bigelow, ed. 5th ed. 1994) (1891) (“A treaty to change the organization of the government, or annihilate its sovereignty, to overturn its republican form, or to deprive it of its constitutional powers, would be void.”). The deliberately vague boundaries Of the Treaty Power would probably relegate that court to the unenviable position of saying it knew a violation when it saw one.
Before the outer limits of the treaty power are reached, however, it may be that federalism does have some effect on a treaty’s constitutionality. While it is not our prerogative to ignore Holland’s rejection of federalism limitations upon the Treaty Power, the Supreme Court could clarify whether principles of federalism have any role in assessing an exercise of the Treaty Power that goes beyond the traditionally understood subject matter for treaties. Holland itself indicates that "invisible radiation[s] from the general terms of the Tenth Amendment" may be pertinent in deciding whether there is any space between obviously valid treaties and obviously ultra vires treaties and whether, in that space, some judicial review of treaties and their im *165 plementing legislation may be undertaken to preserve the federal structure of our government. The "invisible radiation[s]” imagery, 252 U.S. at 433-34, 40 S.Ct. 382, is unusual but, in light of current conceptions about the breadth of the Treaty Power, it may well be worth taking seriously. Cf. Printz, 521 U.S. at 921-22, 117 S.Ct. 2365 (stating that the concept of dual sovereignty was "one of the Constitution’s structural protections of liberty”).

. As Judge Rendell correctly points out in her concurrence, Bond's emphasis is entirely misplaced to the extent she may be contending that her prosecution violates the Necessary and Proper Clause because the United States did not have to prosecute her to comply with its obligations under the Convention. (See Rendell Concurrence Op. at 167 ("Examining the scope of Congress’s Necessary and Proper Power by definition requires us to examine the Act, not its enforcement.”).)

. The decision to use the Act — a statute designed to implement a chemical weapons treaty — to deal with a jilted spouse’s revenge on her rival is, to be polite, a puzzling use of the federal government’s power.

. Although we acknowledge that the Raich court’s admonition against excising a class of activities from a valid assertion of federal power may have related to its status as a Commerce Clause case based on the aggregation principle employed in that context, see Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L.Rev. 915, 936 (2011) (opining that Raich "can be read as rejecting the possibility of successful as-applied challenges to assertions of legislative power under the Commerce Clause”), the principle would seem to hold with respect to federalism challenges arising from treaties within the Treaty Power’s core. As we have already observed, see supra note 18, it is hard to argue with Holland's rejection of federalism as an applicable concept as far as such treaties are concerned.